SOONER FEDERAL SAVINGS AND
LOAN ASSOCIATION

v.

The UNITED STATES.

No. 482–81T.

United States Claims Court.

March 7, 1984.

E. John Eagleton, Tulsa, Okl., for plaintiff. Thomas G. Potts, James A. Hogue, Charles D. Harrison and Houston & Klein, Inc., Tulsa, Okl., of counsel.

Israel D. Shetreat, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D.C., of counsel.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

The plaintiff filed suit to recover $1,047,791 in federal income taxes and interest for tax years 1964 through 1969 and 1973. The government has filed counterclaims for $18,822 for an alleged erroneous refund of 1973 taxes and $20,134 for an alleged erroneous refund of plaintiff's 1966 taxes. The parties have moved for summary judgment on the basis of a partial stipulation of facts, depositions, affidavits and documentary exhibits.

The issue is whether or not plaintiff is entitled to a bad debt loss equal to the difference between its basis for property and the fair value of the property, where the property was acquired from an affiliate joined in a consolidated income tax return and the affiliate had shortly prior thereto obtained the property in a transaction in the nature of a foreclosure on a mortgage debt.

It is concluded herein that there is a material dispute of facts necessary for a decision on the merits. Hence both parties' motions for summary judgment are denied.

## FACTS

This dispute arose from an investment by plaintiff, Sooner Savings and Loan Association (Sooner), and its wholly owned subsidiary, First Home Service Corporation (First), in the development and construction of the Timbers, a planned 260 unit residential condominium project in Tulsa, Oklahoma. Sooner is a federally chartered savings and loan association engaged in the business of making loans secured by first mortgages on real estate from the savings deposits it attracts from the general public.

Sooner, the largest savings and loan association in Oklahoma, is a mutual savings institution as described in § 593(a) of the Internal Revenue Code.[1] First is primarily engaged in owning real estate, making real estate investments, and other related operations. Sooner, First and other members of an affiliated group report their income on a consolidated return.

Sooner's involvement with the Timbers project began on May 7, 1974, with an agreement to provide construction financing for the Timbers to Lang Developments, Inc. (Lanco) and its owners, John and Gloria Lang (the Langs). The construction loan was limited to $3.5 million. About 2 years earlier, the Firstul Mortgage Company (Firstul), a subsidiary of the First National Bank and Trust Company of Tulsa, had agreed to provide up to $1 million for acquisition and development (A & D) of the Timbers site. Firstul's loan was secured by a first mortgage on all of the subject real property. Because of this previous first mortgage and a Federal Home Loan Bank Board (FHLBB) requirement that Sooner's loans be secured by first mortgages,[2] the May 7, 1974, agreement between Sooner and the Langs and Lanco provided that as each building in the Timbers was started, Firstul would receive a predetermined amount of money, and would simultaneously release its underlying first mortgage for the portion of the real estate

---

1. All statutory references are to the Internal Revenue Code of 1954, as amended (I.R.C.), unless otherwise specified.

2. 12 C.F.R. § 545.6–1 (1976) provides in part: Any Federal association * * * may * * * make the following types of loans on the security of first liens on improved real-estate and the use by such an association of loan plans, practices and procedures which comply with the applicable provisions of §§ 545.6 to 545.6–13, are hereby approved by the Board * * *.

whereon the building was to be constructed. Plaintiff would then obtain a first lien on that portion of the Timbers project encompassed by that specific building, and Firstul would retain its first mortgage on the remainder of the project.

The development of the Timbers project was more expensive than the developer had originally anticipated, and in 1975, Lanco requested additional A & D and construction funds from either Firstul and/or Sooner. Firstul denied Lanco's request, but plaintiff agreed to assist Lanco with additional financing. On August 25, 1975, Sooner and its subsidiary, First, executed a Supplemental Loan Agreement with Lanco and the Langs. Under this agreement, Sooner raised the construction loan ceiling from $3.5 million to $4.6 million and agreed to provide $405,000 of additional A & D financing through First, if it was unable, which it was, to persuade Firstul or a third-party to provide this additional A & D financing.

As a consequence of the aforementioned FHLBB regulations, Sooner used First to fund the additional A & D financing, because this additional loan was not to be secured by a first mortgage.

The Supplemental Loan Agreement also committed the developer to a specific minimum sales requirement and provided First with a 51 percent profits or loss interest in the project. Furthermore, the agreement detailed deed in lieu of foreclosure procedures for use if the minimum sales requirements were not met.

On February 3, 1976, Sooner and First agreed to increase the construction loan cap to $5 million and the A & D loan cap to $600,000. The guaranteed minimum sales requirement contained in the August 25, 1975, supplemental loan agreement was not modified by this agreement.

Plaintiff continued to advance the A & D funds to First, and First in turn continued to advance funds to the developer. As of April 30, 1976, Sooner's account receivable from First reflected a balance of $1,067,166, which included, among other advances, $569,744 in A & D loans and other amounts advanced to Lanco.

By April 1976, it was apparent to Sooner that the developer would not meet the guaranteed minimum sales requirement contained in the Supplemental Loan Agreement, and on April 14, 1976, plaintiff notified Lanco that it intended to issue to it a notice of default on or about May 1, 1976.

On April 30, 1976, an agreement was executed between Sooner, First, Lanco and the Langs. Under this agreement, the parties terminated their relationship as either lender or borrower and/or as joint venturers. The agreement also provided that Lanco would sell all its interest in the Timbers' project to Sooner or First in exchange for $25,000 payable on May 3, 1976, and for Sooner's and First's agreement jointly and severally to assume all of the indebtedness and liability of Lanco and/or Lang on such project. The assumed indebtedness appears to have included approximately $860,000 owed to Firstul and the sums owed to Sooner and First. The parties further agreed that the transaction would be advertised as a sale and a turnover of the project by Lanco to First and/or Sooner, rather than a foreclosure.

On May 3, 1976, in return for $25,000 the Langs executed a special warranty deed transferring the Timbers project to First, subject to mortgages of record due Firstul and to Sooner and/or First. On May 25, 1976, First executed a general warranty deed transferring the Timbers to Sooner.

On July 17, 1976, the FHLBB instructed Sooner to obtain appraisals of commercial and speculative properties which it had acquired during 1976 by foreclosure or by deed in lieu of foreclosure, including the Timbers.[3] An appraiser selected by the FHLBB assigned a value to the Timbers of

---

**3.** An FHLBB report stated that as of June 30, 1976, construction had begun on 113 units of the Timbers project. Of these, 25 were completed, 62 were complete to the trim-out stage, re-quiring about $10,000 per unit to finish, and 26 had only the slab poured. Of the completed units, only 14 had been sold.

$2 million as of November 16, 1976. On March 10, 1977, FHLBB examiners directed Sooner to reduce the value of the Timbers project on its books from $5,475,249 to $2,000,000 as of December 31, 1976.

Plaintiff reduced its basis in the Timbers to $2,000,000, and in reliance on Treas.Reg. § 1.595–1(e)(1), it deducted $3,822,878 from income and added it to its 1976 bad debt reserve. This charge resulted in a net operating loss for 1976 and was carried back to tax years 1964–69 and 1973, producing overpayments with respect to those years. Plaintiff filed amended returns claiming a total refund of $1,047,790.

The Internal Revenue Service initially allowed a portion of the addition to plaintiff's bad debt reserve and refunded to the plaintiff $20,134 of the $191,699 claimed for 1966 and $18,882 of the $287,718 claimed for 1973. It denied all other claims for refunds based on Sooner's write down of the Timbers. Plaintiff filed this suit for refund on August 5, 1981. The defendant filed a timely counterclaim to recover the 1966 and 1973 refunds.

### DISCUSSION

### I

Plaintiff bases its claim for refund on I.R.C. §§ 166 and 595 and the regulations issued pursuant thereto. Section 166(c) allows a deduction from gross income for bad debts or for "a reasonable addition to a reserve for bad debts." Section 595 provides that "no gain or loss shall be recognized" and no debt shall be considered as worthless or partially worthless by a building and loan association described in § 593(a) upon the acquisition in the nature of a foreclosure of property used to secure an outstanding loan. Instead, the property so acquired is considered, for purposes of § 166, as "property having the same characteristics as the indebtedness for which such property was security." It is only when the association sells or otherwise disposes of the property that the proceeds are to be treated as a payment on the debt and any loss with respect thereto is to be treated as a bad debt to which § 166 applies.[4]

As directed by § 595(d), the Secretary of the Treasury has prescribed regulations to carry out the purposes of § 595. Since Regulations § 1.166–2(d), authorizes a bank or other corporate taxpayer subject to federal and state supervision to charge off a debt as worthless in whole or in part in obedience to the specific order of the federal or state regulatory body, Regulations § 1.595–1(e)[5] likewise authorizes a building

4. § 595. Foreclosure of opportunity securing loans

(a) *Nonrecognition of Gain or Loss as a Result of Foreclosure.*—In the case of a creditor which is an organization described in section 593(a), no gain or loss shall be recognized, and no debt shall be considered as becoming worthless or partially worthless, as the result of such organization having bid in at foreclosure, or having otherwise reduced to ownership or possession by agreement or process of law, any property which was security for the payment of an indebtedness.

(b) *Character of Property.*—For purposes of sections 166 and 1221, any property acquired in a transaction with respect to which gain or loss to an organization was not recognized by reason of subsection (a) shall be considered as property having the same characteristics as the indebtedness for which such property was security. Any amount realized by such organization with respect to such property shall be treated for purposes of this chapter as a payment on account of such indebtedness, and any loss with respect thereto shall be .treated

as a bad debt to which the provisions of section 166 (relating to allowance of a deduction for bad debt) apply.

(c) *Basis.*—The basis of any property to which subsection (a) applies shall be the basis of the indebtedness for which such property was security (determined as of the date of the acquisition of such property) properly increased for cost of acquisition.

(d) *Regulatory Authority.*—The Secretary shall prescribe such regulations as he may deem necessary to carry out the purposes of this section.

5. § 1.595–1 *Treatment of foreclosed property by certain creditors.*

(e) *Characteristics of acquired property* —(1) *Depreciation; decline in fair market value.* Section 595(b) provides, in part, that for purposes of section 166 (relating to bad debts) acquired property shall be considered as property having the same characteristics as the indebtedness for which such property was security. Thus, no deduction for exhaustion,

and loan association to treat the property acquired as a result of foreclosure or similar proceedings as wholly or partially worthless for purposes of § 166.

This regulation conforms with the legislative history of § 595. The Senate Committee Report accompanying the enactment of § 595 states:

Thus for bad-debt (or loss) purposes the act of foreclosure will not create a taxable occasion; however if the property has depreciated in value, the decline may be charged against the bad-debt reserve as a partially worthless debt. If it continues to decline in value, additional charges may be made against the reserve. When the property is ultimately sold or disposed of, the difference between any amount realized and the original or previously reduced debt, is to be treated as ordinary loss or income and is to be charged or credited, as the case may be, against the reserve for losses on qualifying real property loans.

(S.Rep. No. 1881, 87th Cong., 2nd Sess. at 47–48 (1962), U.S.Code Cong. & Admin. News, 3297, 3350, 1962–3 C.B. at 753–54.)

Accordingly, plaintiff contends that § 1.595–1(e) provides authority for the deduction of the $3,822,879 partial charge-off of the Timbers property for an addition to its bad debt reserve.

Defendant does not dispute the applicability of § 1.595–1(e) to building and loan associations generally, but asserts that under the particular circumstances of this case, namely, that plaintiff's debtor was First, a wholly owned affiliate of plaintiff, and that in the year at issue, 1976, both corporations filed a consolidated tax return, the deduction had to be deferred. Defendant maintains that this result is mandated by the consolidated return regulations, particularly Treas.Reg. § 1.1502–14(d).

Section 1.1502–14(d)(1) provides that to the extent gain or loss is recognized to a member of an affiliated group during a consolidated return year because of a sale or other disposition of an obligation of another member, such gain or loss shall be deferred. For purposes of such section, a deduction because of the worthlessness of, or for a reasonable addition to a reserve for bad debts with respect to such an obligation is considered a loss from the disposition of such obligation. The deferral terminates and the gain or loss is recognized: (1) when the debtor member ceases to be a member of the group; (2) when the stock of the debtor member is disposed of outside the group by the other member; or (3) when the debtor member's obligation is redeemed or cancelled.[6]

---

wear and tear, obsolescence, amortization, or depletion shall be allowed to a creditor with respect to acquired property. However, if, at any time, the adjusted basis of the acquired property exceeds the fair market value of such property (determined by proper appraisal and without regard to any outstanding right of redemption), and the creditor can establish (in the same manner as worthlessness in whole or in part is established for purposes of section 166) that an amount equal to any portion of such excess will not be collected with respect to the indebtedness for which such property was security, the creditor may treat such portion, under the provisions of section 166, as a worthless debt. In such case, the basis of the acquired property shall be reduced by the amount treated as a worthless debt.

6. Section 1.1502–14 provides in part:
    *Stock, bonds, and other obligations of members.*
        \*      \*      \*      \*      \*      \*

(d) *Gains and losses on obligations of members.*—(1) *Deferral of gain or loss.* To the extent gain or loss is recognized under the Code to a member during a consolidated return year because of a sale or other disposition (other than a redemption or cancellation) of an obligation of another member (referred to in this paragraph as the "debtor member"), whether or not such obligation is evidenced by a security, such gain or loss shall be deferred. For purposes of this paragraph, a deduction because of the worthlessness of, or a deduction for a reasonable addition to a reserve for bad debts with respect to, an obligation described in this subparagraph shall be considered a loss from the disposition of such obligation.

(2) *Restoration of gain or loss where obligation leaves group.* If an obligation described in subparagraph (1) of this paragraph is sold or disposed of to a nonmember (or if the member holding the obligation becomes a nonmember), each member with deferred gain or loss with respect to such obligation

Defendant contends that Regs. § 1.1502–14(d) required deferral of Sooner's 1976 addition to its bad debt reserve because—

(1) When on May 3, 1976, First acquired the Timbers property subject to the Sooner loan of approximately $4,500,000 to Lanco and the Langs, plus liability for other advances originating with Sooner, Sooner became the holder of an obligation of another member of its affiliated group (First) within the meaning of Regs. § 1.1502–14(d).

(2) When in payment of the obligation secured by the Timbers property, on May 25, 1976, Sooner acquired such property from First that transaction constituted a "disposition * * * of an obligation" of the debtor member within the meaning of § 1.1502–14(d).

(3) If the receipt of the security for the debt on May 25, 1976, did not constitute the disposition of the obligation to which § 1.1502–14(d) refers, then plaintiff's deduction for partial worthlessness of the debt as of December 31, 1976, did, since § 1.1502–14(d) provides in part:

> For purposes of this paragraph, a deduction because of the worthlessness of, or a deduction for a reasonable addition to a reserve for bad debts with respect to, an obligation described in this subparagraph shall be considered a loss from the disposition of such obligation.

Since § 1.1502–80 provides that "[t]he Code, or other law, shall be applicable to the group to the extent the [consolidated return] regulations do not exclude its application", defendant concludes that the consolidated return regulations operate here to "exclude" the application of Treas.Reg. § 1.595–1(e) with respect to the loss result-ing from the transaction between Sooner and First.

Plaintiff contends that Regs. § 1.595–1(e) provides for an unqualified bad debt deduction to any building and loan association whenever an appraisal of its property received on foreclosure of a secured debt reflects that the association's basis for the property is in excess of its fair market value and the association establishes that the excess will not be collected. Therefore, plaintiff maintains, § 1.595–1(e) supersedes the consolidated return regulations insofar as they provide for the deferral of a bad debt loss deduction where the debt is between affiliated corporations in a consolidated return year.

Plaintiff's argument is not persuasive. The regulations barring or deferring loss deductions on transactions between affiliated corporations filing a single return of consolidated net income supersede the Code sections allowing loss deductions generally, and not vice versa.

Section 1502 directs the Secretary of the Treasury to prescribe such regulations as he may deem necessary clearly to reflect the income tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation. Section 1501 provides that the privilege given an affiliated group of corporations to make a consolidated return is "upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under Section 1502".

under subparagraph (1) of this paragraph shall, except as provided in subparagraph (3) of this paragraph, take such gain or loss into account ratably over the remaining term of the obligation.

(3) *Restoration of gain or loss on other events.* Each member's gain or loss deferred with respect to an obligation under subparagraph (1) which has not been taken into account under subparagraph (2) of this paragraph shall be taken into account immediately before the occurrence of the earliest of the following events:

(i) When such member ceases to be a member,

(ii) When the stock of the debtor member (or any successor in an acquisition to which section 381(a) applies) is considered to be disposed of by any member under § 1.1502–19(b)(2) (other than subdivision (ii) thereof), or

(iii) When the obligation is redeemed or canceled.

The consolidated return regulations have provided for more than 60 years that losses from intercorporate transactions are to be eliminated in computing consolidated net income of affiliated corporations, despite the fact that they are otherwise deductible pursuant to specific provisions of the revenue laws.[7] Regulations § 1.1502–14(d) is but a specific application of the same principle to bad debt losses between affiliates; and that provision too is of long standing, going back almost 50 years.[8] The validity of such provision has never been in doubt, and it has never been held that the enactment of intervening bad debt or other loss deduction provision of the Codes or other revenue laws has ever superseded them.

◼ Next, neither § 595 nor Reg. § 1.595–1(e) provide the unqualified right to a deduction, as plaintiff imagines. For the deduction at issue, like the bad debt deduction for any other taxpayer, plaintiff must rely on § 166. Section 595 and Regs. § 1.595–1(e) require a building and loan association to postpone recognition of a bad debt loss on a secured debt from the time of foreclosure on the security until its resale or, at the earliest, its appraisal and the determination that the amount determined to be bad cannot be collected. But nothing in the statute or regulation states that it may not be further deferred, like any other bad debt loss between affiliated corporations, despite § 166.

Plaintiff's claim that § 595 confers a special privilege upon a building and loan association entitling it to exemption from the deferral of inter-affiliate bad debt loss deduction is also not compatible with the legislative intent underlying the enactment of that section. Section 595 was added to the Internal Revenue Code by the Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 960. The legislative committee reports indicate that that section was enacted as part of a general package designed to increase the

taxes of mutual savings banks and building and loan associations rather than to grant them special relief. The committees of both Houses noted that the taxes of such institutions had been virtually nil because of overly liberal deductions for additions to bad debt reserves. The House Committee Report (H.Rep. No. 1447, 87th Cong., 2d Sess. at 33 (1962), 1962–3 C.B. 405, 437), states that it "concluded that the present bad-debt reserve provisions are unduly generous and that they require revision * * * to provide * * * * an assurance that significant tax will be paid on most cases on the retained earnings of these institutions." The Senate Committee Report expressed its agreement with the House. (S.Rep. No. 1881, 87th Cong., 2d Sess. at 40–41, 1962–3 C.B. 707, 746–47.) With respect to the need for §§ 593 and 595, both committees noted that under preexisting law the associations had been taking bad debt deductions at the time of foreclosure on the property securing loans and subsequently in some instances realizing capital gains on the sales of the properties at higher values. The purpose of the new sections was "to avoid these erratic results by providing that in the future a foreclosure is not to be treated as a taxable event, and that amounts received by the mutual savings institution subsequent to the foreclosure are to be treated as payments on the indebtedness." (S.Rep. No. 1881, supra at 47, U.S.Code Cong. & Admin.News, p. 3350, 1962–3 C.B. at 753.) It is clear that there was no legislative purpose whatsoever to supersede or override the operation of the consolidated return regulations with regard to interaffiliate bad debt deductions.

## II

◼ Next, plaintiff contends that even if the bad debt loss between parent and affiliate may not be recognized in a consolidated return year, the affiliate, First, was not the

---

7. See Treas.Regs. 45 (1920 Ed.) under the Revenue Act of 1918, Art. 637, and 1954 Code Regs. § 1.1502–13.

8. Regulations 89 under the Revenue Act of 1934, Art. 40, provided that "No deduction shall be allowed during a consolidated return period on account of worthlessness in whole or in part of any obligation * * * of any member of the affiliated group to any other member of the group."

debtor—that First's role was a purely transitory step in Sooner's effort to realize on the security for Lanco's and the Langs' debt.

Although the application of the rule has not always been clear nor consistent, it is well established that for purposes of attaching tax consequences an "integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together." *King Enterprises v. United States*, 189 Ct.Cl. 466, 474, 418 F.2d 511, 516 (1969) (quoting with approval from *Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders*, 18 (1966)). And *see also American Potash & Chem. Corp. v. United States*, 185 Ct.Cl. 161, 173–75, 399 F.2d 194, 202–03 (1968); *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d 652, 658 (5th Cir.1968); *Commissioner v. Ashland Oil & R. Co.*, 99 F.2d 588 (6th Cir.1938), *cert. denied*, 306 U.S. 661, 59 S.Ct. 790, 83 L.Ed. 1057 (1939); *Kimbell-Diamond Milling Co. v. Commissioner*, 14 T.C. 74 (1950), *aff'd. per curiam*, 187 F.2d 718 (5th Cir.), *cert. denied*, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951); *American Bantam Car Co. v. Commissioner*, 11 T.C. 397 (1948), *aff'd. per curiam*, 177 F.2d 513 (3rd Cir.1949), *cert. denied*, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950).

Defendant acknowledges the validity of the rule against breaking an integrated transaction into separate steps, but argues against its application here on three grounds: (1) It only works one-way—i.e., the government may ignore the separate steps a taxpayer takes to achieve a desired result where it is necessary to assess the proper tax consequences on the substance of the transaction, but the taxpayer may not repudiate the formal structure he has himself set up, in order to obtain a tax advantage; (2) the step transaction rule only applies in the area of corporate reorganizations; and (3) First's receipt of the Timbers property subject to the debt to Sooner was more than a mere transitional step in Sooner's foreclosure on the security for Lanco's and the Langs' mortgage obligation.

It is clear that defendant is mistaken with respect to its first two grounds, and it is concluded that the third ground raises disputed issues of fact that cannot be resolved on the basis of the record supporting the present motions for summary judgment.

That the step transaction rule cuts both ways has been generally assumed and decided. In *Helvering v. New Haven & S.L. R. Co.*, 121 F.2d 985, 988 (2d Cir.1941), Judge Learned Hand stated: "As for the effort of the Commissioner to atomize the plan, as it were; i.e. to separate it into its several steps and treat the last as though it stood alone, it has been repeatedly repudiated." (Citations omitted.) In *Commissioner v. Ashland Oil & R. Co.*, 99 F.2d at 591, the court stated: "And without regard to whether the result is imposition or relief from taxation, the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority." (Citations omitted.) In *Redwing Carriers, Inc. v. Tomlinson*, 399 F.2d at 658, the court wrote: "Equally well established is the corollary that an integrated transaction may not be separated into its components for the purposes of taxation by either the Internal Revenue Service or the taxpayer." (Citations omitted.) And *see also American Potash v. United States*, *supra*, and *Kanawha Gas & Utilities Co. v. Commissioner*, 214 F.2d 685, 691 (5th Cir.1954).

Defendant does not explain why the step transaction rule should be confined to corporate reorganizations, and the cases do not support that view. It is merely an application of the more general rule epitomized by the often quoted phrase that "A given result at the end of a straight path is not made a different result because reached by following a devious path." (*Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613, 58 S.Ct. 393, 394–95, 82 L.Ed. 474 (1938).) In *American Potash & Chem.*

*Corp., Ashland Oil & R. Co.,* and *Kimbell-Diamond Milling Co.,* it was applied to enable treatment of an acquisition of corporate stock with the intent to liquidate and acquire the assets as an acquisition of assets. In *Redwing Carriers* it was applied to treat contemporaneous purchases of new trucks and separate sales of used trucks to the truck dealer as integrated purchases of new trucks with trade-ins. In *Blake v. C.I.R.,* 697 F.2d 473 (2nd Cir.1982), it was applied to a taxpayer's donation of appreciated corporate stock to a charity with the understanding that the charity would liquidate the stock and purchase his yacht with the proceeds so as to treat the transactions as involving a liquidation of the stock by the taxpayer. In *Crenshaw v. United States,* 450 F.2d 472 (5th Cir.1971), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972), a series of transactions, beginning with the taxpayer's liquidation of a partnership interest in real estate and the sale of the real estate to others, and culminating in the reinvestment of the real estate in the partnership by the buyer, was held to be merely a sale of the partnership interest. Following the same rule, in *Biggs v. C.I.R.,* 632 F.2d 1171 (5th Cir.1980), transactions wherein a taxpayer exchanged his real property with a second party, who in turn acquired his property for the exchange by purchase for cash from a third-party, were held to be merely an exchange of property of like kind without gain to the taxpayer despite the second party's purchase.

■ Defendant correctly states that under the substance over form doctrine a taxpayer may not recast a completed transaction to obtain a tax advantage that may have been available under another approach. *See Commissioner v. Nat. Alfalfa Dehydrating,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). However, under the step transaction analysis, "[t]he actual facts of the transaction are not remolded or restructured. The tax consequences of an interim transitory step are ignored, but the facts of each step are neither disturbed nor re-cast." *American Potash,* 185 Ct.Cl. at 175, 399 F.2d at 203.

■ The test for determining whether multiple transaction may be treated as merely steps in a single taxable event has been put in various ways. In *King Enterprises, Inc.,* 189 Ct.Cl. at 475, 418 F.2d at 516, the court stated that there is no universal test applicable to step transactions and that two basic tests have been used. The first is the "interdependence test" which requires an inquiry "whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." (Quoting from *Paul and Zimet, Step Transactions, Selected Studies In Federal Taxation,* 200, 254 (2nd Series (1938).) The second is the "end result" test, which is met when it appears that the purportedly separate transactions "were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result."

In *McDonald's Restaurants of Illinois v. C.I.R.,* 688 F.2d 520, 524–25 (7th Cir. 1982), the court referred to three tests: (1) The "end result test", when it appears that the separate transactions "were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result"; (2) the "interdependence" test, which focuses on whether "the steps are so independent that the legal relations created by one transaction would have been fruitless without a completion of the series"; and (3) the "binding commitment" test, which may have value if the multiple transactions spans a period of several years.

In *American Bantam Car Co.,* 11 T.C. at 405, the court stated that among the factors to be considered are the intent of the parties, the time element, the pragmatic test of the ultimate result, and whether the steps were "so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?"

Whichever combination of tests are used here, it is apparent that the record (consisting of the partial stipulation of facts and exhibits thereto, plus various Internal Revenue Service documents, two depositions and exhibits and an affidavit of an officer of plaintiff), which constitutes the support for the cross-motions for summary judgment, does not provide an adequate basis for determining whether or not the transfer of property to First was merely a step in the foreclosure proceeding against the unrelated borrowers and should or should not be given independent tax effect. Plaintiff's president, who was its general counsel during the pertinent years, stated in an affidavit:—

> As to the inclusion of First into the transfer of title to The Timbers project, it is my best recollection that there were concerns at the time over: (1) how trust funds had been expended on the project by Lanco; (2) any mechanic's or materialman's liens as well as outstanding obligations owing to subcontractors by Lanco; (3) the underlying first mortgage held by Firstul Mortgage Company, and (4) the underlying second lien debt held by First, only through regulatory necessity, on the project. These considerations were, from my best recollection, instrumental in the decision to place title in First for the relatively short period of time in May, 1976.

It is not clear, however, whether such explanation furthers or impairs plaintiff's step transaction argument.

Defendant contends that First received a 51 percent profit or loss interest in the Timbers project for its advances and that this proves its role was not merely transitory. However, plaintiff's president explained in his deposition that the 51 percent interest was provided for in order to stimulate a possible purchase of an equity interest by a third-party, which might help bail out the plaintiff from its unfortunate loan.

These issues cannot be resolved on the present record. For this purpose, a trial will be required at which the parties may submit such proof as they deem necessary to satisfy or reject the application of the step transaction rule to the dealings between Sooner and its affiliate, First.

Accordingly, the motion and the cross-motion for summary judgment are both denied.

A pretrial conference will be necessary to determine the nature of subsequent proceedings. The parties are directed to confer with respect to a preferred date for such a conference within the next 30 days and to notify the court accordingly.