FIRST NATIONAL BANK IN LITTLE ROCK, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2694–80.     Filed August 14, 1984.

---

*Lewis H. Mathis*, for the petitioner.
*Richard D. Ames*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined deficiencies in the amounts of $33,993 and $1,450 in petitioner's Federal income tax for 1974 and 1975, respectively. Other issues having been resolved by the agreement of the parties, the only one remaining for decision is whether petitioner, a national bank, may include loans outstanding to its wholly owned subsidiary, a mortgage company, at the ends of the years before the Court in its loan base for purposes of computing the additions to its bad debt reserve to be deducted on consolidated Federal income tax returns filed with the subsidiary under section 1501.[1]

### FINDINGS OF FACT

Petitioner is a national bank organized under the laws of the United States with its principal place of business in Little Rock, AR. During the years before the Court, petitioner had a wholly owned subsidiary named First National Mortgage Co. (the mortgage company) with which it filed consolidated U.S. Corporation Income Tax Returns (Forms 1120).

The mortgage company was a corporation created by petitioner under the laws of Arkansas in 1971. Petitioner formed the mortgage company in order to provide its customers with financing for home purchases by generating federally insured mortgages handled by the Federal National Mortgage Association. Petitioner's officers believed that conducting the mortgage business through a separate entity would enable it to attract employees who were skilled and experienced in the field of mortgage banking. Petitioner's officers also believed that the prospective purchasers of its loan packages, which were primarily insurance companies and savings and loan associations, would rather deal with a mortgage company than a national bank.

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

The principal business activity of the mortgage company during the years in issue was making loans to home buyers and real estate developers, selling the promissory notes to third parties, and servicing the loans for the third-party investors. The loans to individual home buyers were referred to as "warehouse loans." The loans to real estate developers were referred to as "development loans." The warehouse loans were insured by the Federal Government but the development loans were not.

The mortgage company obtained the funds which it loaned to outsiders from petitioner through intercompany transfers which petitioner treated as short-term loans for financial accounting purposes. The mortgage company's loan requests were subject to the review and approval of petitioner's loan committee, but no such request was denied during the years in question. Interest was charged on the loans at an "arm's-length" rate comparable to the rate which petitioner would have charged on a loan to an unrelated party. All of petitioner's loans to the mortgage company were evidenced by promissory notes. The mortgage company repaid petitioner when the loans that it had made were repaid or sold to third-party purchasers, unless the proceeds were retained to make additional loans.

Petitioner followed a policy of purchasing any uninsured loans made by the mortgage company which were deemed to be uncollectible. Petitioner paid the mortgage company full face value for the loans, thereby protecting the mortgage company from loss. Petitioner would then charge the loss which it had absorbed on the loans to its reserve for loan losses. No such losses were incurred during the years in question, although the mortgage company did suffer some losses on its loans in later years. The losses were absorbed by petitioner.

As noted above, petitioner and the mortgage company filed consolidated Federal income tax returns for the years before the Court. In those returns, petitioner's deduction for bad debts was computed by the reserve method rather than by writing off specific debts deemed to be worthless. The annual addition to the reserve for bad debts was computed by using the percentage method authorized by section 585(b)(2); that is, it was assumed that a certain percentage of loans outstanding

at the end of the year would eventually prove uncollectible. If the amount so computed was larger than the existing balance in the reserve for bad debts, a deduction was claimed for the amount of the difference.

In making this computation, the loans from petitioner to the mortgage company were included in the loan base by which the percentage was multiplied. The mortgage company's loans to outsiders were not included in that base. For example, at the end of 1974, the amount of intercompany loans outstanding from petitioner to the mortgage company was $4,491,987. The mortgage company, in turn, had loans receivable in the amount of $4,606,756 due from outside parties. The $4,491,987 of intercompany loans (not the $4,606,756 loaned to outsiders) was initially included in loans outstanding for purposes of the bad debt deduction. From this figure was subtracted the amount of the fully insured loans made by the mortgage company to outsiders. The resulting figure, the remainder, was then multiplied by the statutory percentage in order to determine the balance needed in the bad debt reserve.

At the end of 1975, the mortgage company was indebted to petitioner in the amount of $5,436,709, and the mortgage company's loans to outsiders amounted to $5,600,788. Consistent with the prior year, only the first figure, representing the intercompany loans, was initially taken into the loan base for computing the bad debt deduction. Again, as in the prior year, the loan base was reduced by the fully insured portion of loans made by the mortgage company to outsiders before computing the year's bad debt deduction.

Respondent disallowed petitioner's additions to its bad debt reserve to the extent they were based on loans outstanding to the mortgage company. Respondent determined that these loans were not properly includable in the loan base for computing the bad debt deduction to be claimed in the consolidated return.

## OPINION

The issue to be decided is the amount by which petitioner is entitled to increase its bad debt reserve in 1974 and 1975. The answer requires the meshing of the bad debt provisions of sections 166 and 585 with the consolidated return provisions of sections 1501 and 1502 and the regulations thereunder. It also

requires consideration of an argument by petitioner based on the minimum tax provisions of section 56 and following sections.

Section 166(a) authorizes a deduction for debts which become wholly or partially worthless within the taxable year. Section 166(c) provides that, in lieu of a deduction under section 166(a) for specific debts which have become worthless, "there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts." In computing a "reasonable" addition to a bad debt reserve under section 166(c), most taxpayers employ the so-called *Black Motor* formula,[2] a 6-year moving average percentage of bad debt losses applied to the current amount of receivables. See *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 548–549 (1979).

In the case of a "bank," as defined in section 581, however, a special computation is provided. A bank's addition to the reserve for bad debts under section 166(c) for the years here in dispute may not exceed the greater of the addition determined under the "experience method" (sec. 585(b)(3), similar to the *Black Motor* formula) or under the "percentage method." The percentage method, applicable for taxable years beginning before 1988, is described in section 585(b)(2)[3] and is the method which petitioner employed to compute the additions to the reserve which are at issue in this case.

Under the percentage method, the addition to the reserve for any particular taxable year is the amount necessary to increase the balance in the reserve to "the allowable percent-

---

[2]See *Black Motor Co. v. Commissioner*, 41 B.T.A. 300 (1940), affd. on other grounds 125 F.2d 977 (6th Cir. 1942).

[3]SEC. 585. RESERVES FOR LOSSES ON LOANS OF BANKS.

(b) ADDITION TO RESERVES FOR BAD DEBTS.—

\* \* \* \* \* \* \*

(2) PERCENTAGE METHOD.—The amount determined under this paragraph for a taxable year shall be the amount necessary to increase the balance of the reserve for losses on loans (at the close of the taxable year) to the allowable percentage of eligible loans outstanding at such time \* \* \*

\* \* \* \* \* \* \*

For purposes of this paragraph, the term "allowable percentage" means 1.8 percent for taxable years beginning before 1976; 1.2 percent for taxable years beginning after 1975 but before 1982; 1.0 percent for taxable years beginning in 1982; and 0.6 percent for taxable years beginning after 1982. \* \* \*

Sec. 585(b)(2)(A) and (B) prescribes certain exceptions which are not at issue in this case.

age of eligible loans outstanding" at the end of the year. Sec. 585(b)(2). For the years in question, the allowable percentage was 1.8 percent. Petitioner contends that its addition to its bad debt reserve should be computed by applying that percentage to its outstanding loans, including its loans to the mortgage company adjusted for the portion of the loans made by the mortgage company that was insured by the Federal Government.[4] Petitioner, a national bank, was eligible to use the percentage method but the mortgage company was not.

Because petitioner elected to file consolidated returns with the mortgage company, however, the consolidated return provisions must be considered. Section 1501 provides that an affiliated group of corporations may elect to file a consolidated return on the condition that all members of the group consent to "all the consolidated return regulations prescribed under section 1502." The filing of the consolidated return serves as such a consent.[5]

Section 1502 provides, in turn, as follows:

> The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

The regulations under section 1502 provide that the corporate income tax of section 11 is imposed on the "consolidated taxable income" of the group. Sec. 1.1502–2(a), Income Tax Regs. Consolidated taxable income, which represents "principally the results of * * * [the group's] dealings with the outside world after the elimination of intercompany profit and loss,"[6] is computed by taking into account first the separate taxable income of each member of the group. Sec.

---

[4] See *First Commercial Bank v. Commissioner*, 45 T.C. 175, 182–183 (1965); *Miners National Bank of Wilkes-Barre v. Commissioner*, 33 T.C. 42, 47 (1959); *State Bank of Albany v. United States*, 209 Ct. Cl. 13, 21–22, 530 F.2d 1379, 1383 (1976), on the exclusion of Government-insured loans from the bad debt reserve base.

[5] Such consent does not preclude an electing group from challenging regulations that are arbitrary or inconsistent with the statute. *Covil Insulation Co. v. Commissioner*, 65 T.C. 364, 374 (1975); *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 802 (1975); *Joseph Weidenhoff, Inc. v. Commissioner*, 32 T.C. 1222, 1242 (1959).

[6] B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.20, at 15–51 (4th ed. 1979).

1.1502–11(a)(1), Income Tax Regs. The separate taxable income of each member is computed as if the member were a separate corporation and then certain modifications are made for intercompany transactions and other items. Sec. 1.1502–12, Income Tax Regs.

Bad debt deductions with respect to obligations of other members of the affiliated group filing consolidated returns are excluded from the definition of the term "intercompany transaction" set forth in section 1.1502–13(a)(1), Income Tax Regs. Treatment of those deductions is provided for separately in section 1.1502–14(d)(1), Income Tax Regs., which is as follows:

(d) *Gains and losses on obligations of members*—(1) *Deferral of gain or loss.* To the extent gain or loss is recognized under the Code to a member during a consolidated return year because of a sale or other disposition (other than redemption or cancellation) of an obligation of another member (referred to in this paragraph as the "debtor member"), whether or not such obligation is evidenced by a security, such gain or loss shall be deferred. For purposes of this paragraph, a deduction because of the worthlessness of, or a deduction for a reasonable addition to a reserve for bad debts with respect to, an obligation described in this subparagraph shall be considered a loss from the disposition of such obligation.

Under this section of the regulations, it is quite clear, the bad debt deduction allowed in the consolidated return must be computed without reference to losses or potential losses arising from obligations payable to members of the affiliated group by other members. Additions to the bad debt reserve of a member based on the obligations of another member of the group are deferred.[7]

In Rev. Rul. 76–430, 1976–2 C.B. 183, the Commissioner considered a situation like the present one in which a bank and its subsidiary constituted an affiliated group of corporations filing a consolidated Federal income tax return. Like the mortgage company in this case, the subsidiary was not a bank. Like petitioner, the bank in the ruling made loans to its subsidiary and included those loans in its base for computing its addition to its reserve for bad debts under section 585. The

---

[7]Deductions which have been so deferred are "restored" upon the occurrence of any of several triggering events such as, for example, the sale of the obligation to a nonmember of the affiliated group. These events are listed in sec. 1.1502–14 (d) (2) and (3), Income Tax Regs., and are not at issue here.

Commissioner ruled that this treatment was improper, stating (1976–2 C.B. at 183–184):

> Section 1.1502–14 (d) (1) of the regulations overrides the deduction allowed to banks under section 166(c) of the Code, computed under section 585, in the instance of loans to affiliated corporations and operates to defer, and thus not currently allow banks filing consolidated returns to claim current deductions under section 166(c) for additions to reserves for bad debts computed under section 585 to the extent that such additions relate to loans to affiliated corporations.

We agree with the position taken in this ruling. The result which the Commissioner reached was clearly correct under the applicable regulation, which was itself well within the broad scope of the mandate granted the Secretary by Congress in section 1502 to prescribe regulations governing consolidated returns.

Respondent's position is also consistent with the purpose of the consolidated return provisions, which, as indicated above, is "to require taxes to be levied according to the true net income and invested capital resulting from and employed in a single business enterprise, even though it was conducted by means of more than one corporation." *Handy & Harman v. Burnet*, 284 U.S. 136, 140 (1931). As two scholars have noted:

> The basic principle of the consolidated return is that the group is taxed upon its consolidated taxable income, representing principally the results of its dealings with the outside world after the elimination of intercompany profit and loss.

B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.20, at 15–51 (4th ed. 1979). To allow a bad debt deduction computed as a percentage of a transfer of funds between companies in the affiliated group would violate this basic principle.

We find nothing in the legislative history of section 585 which suggests that the section was intended to override or supersede the consolidated return regulations where the privilege of those regulations has been invoked. Prior to the enactment of the section, the Internal Revenue Service in Rev. Rul. 65–92, 1965–1 C.B. 112, had granted commercial banks the privilege of building up a bad debt reserve equal to 2.4 percent of outstanding loans not insured by the Federal Government. The House Committee report accompanying the

enactment of section 585 states that, if banks were subject to the same bad debt reserve rules applying to other taxpayers (see the description of the *Black Motor* formula in *Thor Power Tool Co. v. Commissioner, supra*), they would on the average be allowed to build up a bad debt reserve of less than 0.2 percent of outstanding noninsured loans. The House report states that section 585 was designed "to bring the bad-debt reserves allowed for banks into line with the bad-debt reserves allowed for business taxpayers generally." H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 276. To achieve this end, the House bill would have eliminated the percentage method of computing additions to bad debt reserves and limited banks to the experience method. As a means of providing an extra margin of safety for banks, the House bill would have liberalized the net operating loss carryback provisions as applied to banks.

The Senate made changes in the House bill but its committee's report, too, refers to the fact that banks were accorded "more favorable treatment than most other taxpayers" and expresses agreement "with the general objective of curtailing the tax advantages that banks enjoy in regard to bad debt reserves." S. Rept. 91–552 (1969), 1969–3 C.B. 423, 522–523. The Senate version retained as an alternative method the percentage method of computing bad debt reserves but limited additions to 1.8 percent of the outstanding eligible loans instead of the previously allowed 2.4 percent and eliminated the liberalized net operating loss carryback provisions.

Section 585 as finally enacted retained the Senate-modified percentage method as an alternative method but provided for its phaseout over an 18-year period. The bill also restored the liberalized net operating loss carryback provisions for banks included in the House bill. H. Rept. 91–782 (Conf.)(1969), 1969–3 C.B. 644, 633–664.

This legislative history of section 585 does not indicate to us that banks were to be treated differently from other corporations which have elected the privilege of filing consolidated returns. It provides no support for petitioner's argument that, even though it elected to file consolidated returns, it is entitled to add to its bad debt reserve a portion of its loans to the mortgage company. Having elected to avail itself of the consolidated return privilege, petitioner is bound by section 1.1502–14(d) (1), Income Tax Regs. Petitioner may not include

its loans to the mortgage company in its base for computing its permissible addition to its bad debt reserve for 1974 to 1975.

Our conclusion is consistent with that of Judge Miller in *Sooner Federal Savings & Loan Association v. United States*, 4 Cl. Ct. 746, 751–752 (1984). The opinion in that case reaches an analogous result in a case involving the interaction of the consolidated return regulations and section 595. That section and the regulations thereunder authorize building and loan associations in certain circumstances to claim bad debt deductions under section 166 with respect to property acquired through foreclosures. For basically the reasons we have explained, Judge Miller concluded that, because of the taxpayer's election to file consolidated returns, section 1.1502–14(d), Income Tax Regs., controlled the taxpayer's bad debt deduction claim.

Petitioner argues that—

regulations may neither be contrary to Congressional intention, *Commissioner v. South Texas Lumber Co.*, 333 U.S. 496, 503 (1948); nor an arbitrary, unreasonable exercise of * * * power to promulgate those regulations. *American Standard, Inc. v. United States*, 602 F.2d 256 (Ct. Cl. 1979).

Petitioner further states that regulations which "affect *only* the *timing* of the inclusion of an item in gross income, or a deduction therefrom" may be valid but argues that section 1.1502–14(d) (1), Income Tax Regs., has the effect of imposing a "tax upon income where none would otherwise be due."

As we have stated, the regulation operates to defer bad debt deductions attributable to loan transactions between members of an affiliated group. In other words, no bad debt deduction with respect to such loans is permissible until one of the triggering events listed in section 1.1502–14(d)(2) and (3), Income Tax Regs., occurs. (See note 7 *supra*.) At that point, the deduction may be allowable and other appropriate adjustments may follow. The deferral provisions of the regulation are thus timing provisions even though allowance of the deduction in one year rather than another obviously may produce different tax consequences. Significantly, those deferral provisions are not new; the consolidated return regulations have provided for the elimination or the deferral of losses from intercompany transactions for more than 60 years, beginning with article 637, Treas. Regs. 45 (1920) under the Revenue Act

of 1918, Pub. L. 254, 40 Stat. 1057. See *Sooner Federal Savings & Loan Association v. United States*, 4 Cl. Ct. at 752.

Petitioner argues that the regulation should not be interpreted to cause the deferral of its deduction because the deferral of the bad debt deduction on the intercompany loans will cause "problems" to arise under the minimum tax provisions. Section 56(a) provides that corporations are liable for a tax equal to 15 percent of the amount by which the "items of tax preference" exceed $10,000 or "the regular tax deduction," a specially defined concept. Section 57(a)(7)[8] provides that, in the case of a financial institution, such as petitioner, to which section 585 applies, the amount by which the "allowable" addition to the reserve for bad debts computed under the percentage method exceeds the addition which would have been allowable under the experience method (i.e., generally, the *Black Motor* formula) constitutes an item of tax preference. The regulations provide that:

For purposes of this paragraph, the amount of the deduction allowable for the taxable year for a reasonable addition to a reserve for bad debts is the amount of the deduction allowed under section 166(c) by reference to section 585 or 593. [Sec. 1.57–1(g)(3), Income Tax Regs.]

Petitioner states that it fears that the minimum tax would be imposed on excess deductions *allowable* under sections 166 and 585 even though they were not actually *allowed* under the consolidated return regulations. From this premise, petitioner argues that—

Congress never intended to subject financial institutions to a tax preference item, where the financial institution received no tax * * * benefit due to application of some other Code section, or its attending regulations. Congress clearly intended to associate the tax preference item with the year in which the tax benefit was enjoyed.

---

[8]SEC. 57. ITEMS OF TAX PREFERENCE.
(a) IN GENERAL.–For purposes of this part, the items of tax preference are—

\* \* \* \* \* \* \*

(7) RESERVES FOR LOSSES ON BAD DEBTS OF FINANCIAL INSTITUTIONS.—In the case of a financial institution to which section 585 or 593 applies, the amount by which the deduction allowable for the taxable year for a reasonable addition to a reserve for bad debts exceeds the amount that would have been allowable had the institution maintained its bad debt reserve for all taxable years on the basis of actual experience.

Therefore, the argument apparently runs, because the bad debt deduction gives rise to a tax preference item, whether the deduction is deferred or not under the consolidated return regulations, Congress must have intended that it *not* be deferred, so that taxpayers will at least have the benefit of their tax preference items. We do not agree with this argument.

In the first place, we do not think that much about congressional intent as to the provisions regarding consolidated returns can be inferred from the workings of the minimum tax. These two sets of statutory provisions are essentially distinct. They may interact with one another, but we find no concrete indication that the particular interaction foreseen by petitioner was ever considered by Congress when it enacted the minimum tax provisions. Cf. S. Rept. 91–552 (1969), 1969–3 C.B. 423, 497.

Second, we are not convinced that petitioner's interpretation of the minimum tax provisions of the Code and regulations is correct. Petitioner argues that, under the provisions cited above, its bad debt deduction would give rise to an item of tax preference in the current year even if the deduction were deferred to a future year under the consolidated return provisions, or, in other words, that there would be an item of tax preference with no corresponding tax benefit. We do not agree.

In the course of the consideration of legislation which became the Tax Reform Act of 1969, Congress found that there was an unfair distribution of the tax burden because certain "individuals and corporations * * * [did] not pay tax on a substantial part of their economic income as a result of the receipt of various kinds of tax-exempt income or special deductions." S. Rept. 91–552 (1969), 1969–3 C.B. 423, 495; cf. *Graff v. Commissioner*, 74 T.C. 743, 767 (1980), affd. 673 F.2d 784 (5th Cir. 1982). As one example of these "tax preferences," the Committee report states that (1969–3 C.B. at 495):

Financial institutions * * * pay lower taxes than other corporations to the extent that their deductions for bad debt reserves exceed the deductions that would be allowed on the basis of actual loss experience.

The House bill, in general terms, (1) limited tax-free income to a percentage of the aggregate of a taxpayer's taxable income

and otherwise tax-free income, and (2) required an allocation of certain deductions between taxable and nontaxable income. The objective was to reduce the tax advantages and benefits derived from these tax preference items. H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 200, 249–250. The bill, as finally enacted, instead of limiting the several tax exemptions and special deductions, imposed a tax, subject to limitations, on amounts of tax preference items. H. Rept. 91–782 (Conf.) (1969), 1969–3 C.B. 644, 658. Section 56 refers to it as the minimum tax and describes it as being "In addition to the other taxes imposed" by chapter 1 of the Code.

From this legislative history, as we read it, two general principles underlying the minimum tax emerge. First, the tax was intended to limit the tax benefits and advantages from certain tax exemptions and special deductions referred to as tax preference items. The purposes of the tax will not be served if it falls on items from which the taxpayer derives no tax benefit or advantage. Second, Congress did not undertake a revision of the Code provisions granting the tax preferences or other substantive provisions such as the consolidated return regulations. Instead, liability for this additional tax is generally to be measured by the provisions imposing it.

In confirmation of this view, the Congress, in the Tax Reform Act of 1976 (sec. 301(d)(3), Pub. L. 94–455, 90 Stat. 1553) added section 58(h) to the Code. In that section, Congress directed the Secretary to—

Prescribe regulations under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years.

The legislative history of the section indicates that the Internal Revenue Service had already recognized that tax preference items were limited to items that created tax benefits.[9]

---

[9]S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 151–152, explained the reasons for sec. 58(h) as follows:

"*Tax benefit rule.*—There are certain cases under present law in which a person derives no tax benefit from a tax preference. For example, if an individual has no adjusted gross income because of deductions for accelerated depreciation on real property (an item of tax preference under the minimum tax) and also has itemized deductions (which under these circumstances he is unable to use), the tax benefit from the accelerated depreciation deductions may be reduced or eliminated because of the unused itemized deductions. However, the individual may still be subject to the

The regulations directed by section 58(h) have not yet been promulgated, but respondent has acknowledged that:

The intent of Congress in enacting section 58(h) of the Code was that tax preference items that are of no tax benefit to a taxpayer are not to be included in the computation of the minimum tax on tax preferences. * * *

Rev. Rul. 80–226, 1980–2 C.B. 26, 27. It is, accordingly, highly doubtful that the unfair result which petitioner foresees would be advocated by respondent. Even if the potential for such unfairness arising out of a conflict between the minimum tax and other Code provisions did exist, the minimum tax provisions indicate that Congress intended the remedy to lie in proper adjustment of the minimum tax rather than the other provisions of the Code.

Petitioner argues further that, even if the bad debt deductions which were deferred under the consolidated return regulations did not give rise to minimum tax liability in the year of the deferral, distortion would still result in the minimum tax liability of the year in which the deductions were restored under section 1.1502–14(d)(2) and (3), Income Tax Regs.[10] As petitioner puts it: "Under respondent's approach, the entire deferred tax preference item is slam-dunked into the minimum tax calculation for the year in which the restoration event occurs." Petitioner argues that the bunching of bad debt deductions in this manner in the year of the restoration event would cause the taxpayer to lose the benefit of the annual minimum tax exemption of section 56(a)(1) and that problems would arise in the computation of the amount of the preference item. As noted above, it is the excess of the deduction under the percentage method over the deduction which would have been allowed under the experience method which constitutes the preference item. Sec. 57(a)(7). Petitioner argues that the experience of the taxpayer in collecting its loans may change between the year of the deferral of the bad

---

minimum tax on the accelerated depreciation. Similar problems can occur in the case of deductions for percentage depletion, the capital gains deduction, rapid amortization and intangible drilling expenses. *To some extent, the Internal Revenue Service has been able to deal with this issue through regulations.* To deal with this problem specifically, the amendment instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax benefit from the preference. For this purpose, a tax benefit includes tax deferral even if only for one year. * * * [Emphasis added.]"

[10]See note 7 *supra*.

debt deduction and the year of its restoration, thus complicating the computation of the preference item in the year of restoration.

This argument, too, must fail. The "problems" which petitioner foresees are, in our view, merely consequences of viewing the affiliated group as a single entity, consistent with the overall purpose of the consolidated return provisions. If the bad debt deductions are bunched in a restoration year, as petitioner foresees, it is because it is in that year that the debtor-creditor relationship is extended beyond the affiliated group, whether because the obligation is sold to a nonmember, because the member holding the obligation is sold to a nonmember, because the member holding the obligation ceases to be a member, or because some other restoration event occurs. See sec. 1.1502–14(d)(2) and (3), Income Tax Regs. Prior to the restoration event, the affiliated group, viewed as a whole, has no debt receivable from outsiders. The bunching caused by the occurrence of a restoration event is, therefore, no worse than the "bunching" that would result if a single banking corporation, not a member of an affiliated group, happened to make an unusually high amount of loans in a particular year. In short, we find petitioner's argument regarding the minimum tax attenuated and unpersuasive.

In sum, petitioner made loans to its wholly owned subsidiary, the mortgage company, and has made a series of statutorily authorized elections with respect to its 1974 and 1975 bad debt deductions. First, it elected the reserve method authorized by section 166(c) in lieu of the deduction of wholly or partially worthless debts under section 166(a). Had it not made this election, it would not have been entitled to any deduction with respect to its loans to the mortgage company because neither it nor the mortgage company suffered any actual losses during the years before the Court. Second, petitioner elected under section 585(a) to compute its addition to the bad debt reserve under the percentage method rather than the experience method. Using the percentage method, it claims deductions based on the statutory 1.8 percent of "eligible" loans, whereas, under the experience method, it would have had no actual losses from its dealings with the mortgage company to take into account. Significantly, also, because the mortgage company was not a bank, as defined in

section 581, it was not eligible to use the percentage method with respect to its own loans. Third, petitioner elected to file consolidated returns with the mortgage company and the consolidated return regulations, to which petitioner consented, specifically provide that any otherwise allowable bad debt deduction arising from intercompany loans must be deferred until one or more triggering events have occurred. Even though the consolidated return election may not in this respect produce tax results as favorable as separate returns might have provided,[11] we think petitioner is bound by its election. As this Court has said in another context, petitioner, having elected to file consolidated returns, must "take the bitter with the sweet." *Georgia-Pacific Corp. v. Commissioner*, 63 T.C. 790, 802 (1975).

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[11] Respondent argues in the alternative that the deduction with respect to the intercompany loans must be denied because petitioner's loans to the mortgage company were not "eligible loans" within the meaning of sec. 585(b)(2). Because we have already decided this issue on the basis of the consolidated return regulations, we need not consider respondent's alternative position.