BOWATER INCORPORATED, F.K.A. BOWATER HOLDINGS, INC., AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bowater Inc. v. Commissioner
Docket No. 18436-91
United States Tax Court
T.C. Memo 1995-164; 1995 Tax Ct. Memo LEXIS 153; 69 T.C.M. (CCH) 2382; April 10, 1995, Filed *153 Decision will be entered under Rule 155. For petitioners: Robert T. Carney. For respondent: Stephen M. Miller. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax totaling $ 3,231,988 for 1976, $ 5,214,010 for 1979, and $ 27,096,396 for 1980. The issue for decision is whether amounts denoted as interest were properly deducted under section 163 [1] or were actually dividends. The interest at issue was paid on declared but unpaid dividends, and totaled $ 2,444,229 in 1979 and $ 2,239,170 in 1980. Due to concessions made by the parties and in light of a previous opinion in this case by this Court, Bowater, Inc. v. Commissioner, 101 T.C. 207 (1993), a computation under Rule 155 will be necessary.
Petitioner, Bowater *154 Incorporated, is a domestic corporation organized under the laws of Delaware. At the time the petition was filed, its principal place of business was located in Darien, Connecticut. During the period from January 1, 1975, through December 31, 1980, petitioner was known as Bowater Holdings, Inc. Use of the term "petitioner" hereinafter refers to Bowater Holdings, Inc., during the period from 1975 through December 31, 1980. The parties stipulated that "During the calendar years 1975 through 1980, [p]etitioner's stock was wholly owned by Bowater Corporation Limited, a publicly-held corporation incorporated in the United Kingdom ('UK'), and a wholly-owned subsidiary of Bowater Corporation Limited known as Bowater Overseas Holdings, Limited, also a UK corporation. Bowater Corporation Limited and Bowater Overseas Holdings, Limited will hereinafter be referred to in combination as 'Bowater UK'." Petitioner and its subsidiaries that constitute "includible corporations" (within the meaning of section 1504(b)) filed consolidated Federal income tax returns for the 1979 and 1980 calendar taxable years with the Internal Revenue Service Center in Memphis, Tennessee. Both petitioner and Bowater *155 UK maintained their books and records on a calendar year basis. Prior to 1975, petitioner generally declared dividends payable to Bowater UK in the latter part of the year out of earnings attributable to that year, and paid the dividends shortly after declaration. In 1976, petitioner and Bowater UK "entered into an oral understanding" that petitioner would begin declaring dividends in the early part of the year, attributable to earnings of the immediately prior year, to be payable on or within days of declaration. This understanding was applied to subsequent periods, including the years at issue. In accordance with this understanding, no cash was to be transferred to Bowater UK on the dates that the dividends described were declared payable. Such amounts (less applicable withholding) were not remitted and were recorded on the books of petitioner as a liability owing to Bowater UK. No written correspondence or memoranda, if they existed, regarding this understanding were made part of the record. On its books, petitioner made entries to a separate Trade Account Payable, payable to Bowater UK in the amounts of the declared dividends less the amounts withheld for Federal withholding *156 taxes. At the time the dividends were declared, Bowater UK recorded the liabilities as accounts receivable on its books and certified financial statements. These liabilities were removed from petitioner's books when the funds were remitted by petitioner. Immediately after the declaration of the dividends described above, petitioner withheld from the declared dividends, and paid to the Internal Revenue Service (IRS), withholding tax pursuant to section 1442(a). The amounts of this withholding tax in 1979 and 1980 were $ 3,005,063 and $ 2,423,813, respectively, at the 15-percent rate in effect at the time under the US-UK tax treaty. Under UK law, this withholding tax entitled Bowater UK to foreign tax credits. There was no written agreement with respect to interest on the liabilities at issue, but the interest payments were included in the understanding between petitioner and Bowater UK with respect to the liabilities at issue. Petitioner accrued interest monthly, at a rate initially equal to 125 percent of the prime rate, on the liabilities at issue. The interest rate was later reduced to 100 percent of the prime rate. This interest was accrued, for financial statement and *157 tax purposes, by Bowater UK and was included in the certified financial statements of Bowater UK. The interest rate utilized by Bowater UK and petitioner in computing the amount of the interest payments at issue is not in dispute. Beginning in 1976, the dividends, declaration dates, [2] remittance of funds dates, and the amounts of interest paid and deducted by petitioner with respect to the liabilities referred to above, were as follows: Date of
For Amount of
Date Funds
Amount Interest Declaration
Year
Dividend Remitted
Remitted [3]
Remitted 12/23/75
$ 3,500,000
9/9/76
$ 2,975,000
4/1/76
1975
16,500,000
12/22/76
14,025,000
$ 1,048,387
1/3/77
1976
20,000,000
12/14/77
17,000,000
1,364,221
1/3/78
1977
25,000,000
12/18/78
21,250,000
2,277,643
1/2/79
1978
20,033,750
12/6/79
17,028,687
2,444,229
1/2/80
1979
16,158,750
12/17/80
13,734,937
2,239,170
*158 Petitioner also declared and paid in cash a dividend in December 1980 in the amount of $ 7,100,008. Bowater UK regularly declared and paid annual dividends to its shareholders. Under UK accounting principles, a UK company could declare dividends only to the extent of its distributable reserves. Furthermore, a UK company could not consolidate the earnings of its subsidiaries into its distributable reserves account. The earnings of subsidiaries had to be first declared as a dividend in order to be included in the distributable reserves of the parent company. During the years at issue, and prior to that period, distributable reserves to support dividends were derived only from Bowater UK's current income from each year. Accordingly, current year distributable reserves, primarily dividends from subsidiaries, were required to be equal to or in excess of the sums Bowater UK declared as dividends to its shareholders during each of the years at issue. Under UK accounting principles, Bowater UK was permitted to record a dividend from petitioner as distributable reserves with respect to a completed year so long as the dividend was declared prior to the rendering of the financial statements *159 of Bowater UK, and the approval of the financial statements by its board of directors. Bowater UK included the dividends declared by petitioner in January 1979 and January 1980 in its distributable reserves for its 1978 and 1979 years, respectively. As such, the amounts of those dividends were available for the declaration of dividends by Bowater UK for the years 1978 and 1979, respectively. These amounts could not have been declared as dividends by Bowater UK if petitioner had not declared its dividends prior to the issuance of Bowater UK's financial statements and approval of those financial statements by its board of directors. Bowater UK was required to fund all or part of the dividends to its shareholders with additional borrowings pending remittance of the liabilities in question. As a result, Bowater UK had higher third-party borrowings in the period between the dividend declarations by petitioner and the dates upon which they were remitted. These borrowings incurred interest costs that were partially or entirely offset by the amounts designated as interest, which are at issue in this case. The parties stipulated that the declaration of the dividends in each of the periods *160 at issue created, under applicable State (Delaware) law, an enforceable obligation of petitioner to pay money to Bowater UK. No scrip or other written evidence of indebtedness (other than the entries on petitioner's and Bowater UK's books of account as described above) with respect to the liabilities referred to herein was issued by petitioner to Bowater UK. No collateral was specifically pledged as security for the liabilities at issue, but petitioner was at all times solvent and able to make, and in fact did remit cash in satisfaction of the liabilities at issue. When the liabilities at issue were created, there was no specified date for payment. However, pursuant to the understanding between petitioner and Bowater UK, payment in cash would be made at a convenient time mutually agreed upon by the parties, but before the end of the year in which the dividend was made. During the years at issue, a first-tier subsidiary of petitioner, which was the parent of a group of pulp, paper, and newsprint manufacturing and sales subsidiaries, was known as Bowater Incorporated (collectively referred to herein with its subsidiaries as "Manufacturing Group"). Petitioner was the sole shareholder *161 of Bowater Incorporated. Each subsidiary of petitioner, including those within the Manufacturing Group, had its own officers and board of directors, some of whom were officers and/or directors of more than one entity. Petitioner's activity was the supervision of the management of its subsidiaries, including their cash management and borrowing decisions. Petitioner was not otherwise engaged in a trade or business. Petitioner's only substantial assets were the stocks of its subsidiaries. During the years at issue, the Manufacturing Group was engaged primarily in the manufacture and sale of newsprint, coated paper, and wood pulp at manufacturing facilities in Catawba, South Carolina, and Calhoun, Tennessee. A $ 110 million, 20-year debt offering was undertaken by the Manufacturing Group in 1977, primarily to finance the expansion of its newsprint manufacturing facilities at the Calhoun, Tennessee, mill. The proceeds of this debt offering were distributed to Manufacturing Group in two steps, $ 60 million in 1977 and $ 50 million in 1978. In 1979, the Manufacturing Group completed the expansion of its newsprint manufacturing operations with the construction of an additional newsprint *162 machine and related facilities in Calhoun, Tennessee. This expansion of newsprint production at the Calhoun, Tennessee, mill required a capital expenditure in excess of $ 90 million and resulted in the largest newsprint mill in the United States. The total amounts of long-term and short-term debt, and the total amounts of debt owed to related companies outside of petitioner's consolidated group by the Manufacturing Group at the close of each of the calendar years 1975-80, inclusive, as shown on the consolidated financial statements of Manufacturing Group are as follows: In Thousands of Dollars
1975
1976
1977
1978 1979 1980 Total Long-
Term Debt
$ 77,784
$ 69,346
$ 95,660
$ 141,547
$ 138,012
$ 141,893
Total Short-
Term Debt
75,299
87,503
108,538
123,828
111,261
126,112
Debt Owed
to Related
Companies [4]
7,265
18,795
36,731
46,786
50,081
35,468
The corresponding figures for petitioner *163 (and affiliates consolidated for financial statement purposes as shown on the consolidated financial statements of petitioner) are: In Thousands of Dollars 1975
1976
1977
1978
1979
Total Long-
Term Debt
$ 105,082
$ 108,343
$ 155,988
$ 184,147
$ 138,012
Total Short-
Term Debt 128,765
166,838
84,606
112,820
110,696
Debt Owed
to Related
Companies
Short-Term
13,246
21,936
33,049
47,234
50,518
Long-Term
20,603
-
2,182
1,819
1,455
1980 Total Long-
Term Debt
$ 141,893
Total Short-
Term Debt
130,844
Debt Owed
to Related
Companies:
Short-Term
38,526
Long-Term
1,091
As of June 1975, the Manufacturing Group had outstanding unsecured lines of credit in the total amount of $ 27 million, for which the Manufacturing Group was required to maintain a "compensating balance" (i.e., a non-interest-bearing cash deposit with the lenders) equal to 10 percent of the amount of the credit line. The total outstanding lines of credit did not decrease throughout the calendar years 1975-80, inclusive. These lines of credit were drawn upon during the years 1975-80, inclusive. In the notice of deficiency the Commissioner reclassified the interest at issue *164 as additional dividends, and disallowed the interest deductions claimed for Federal income tax purposes. Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Interest has been defined as "the amount which one has contracted to pay for the use of borrowed money." Old Colony R.R. v. Commissioner, 284 U.S. 552, 560 (1932). It has also been described as "compensation for the use or forbearance of money." Deputy v. du Pont, 308 U.S. 488, 498 (1940). Deductibility under section 163(a) requires not only the payment of "interest", but also that the "interest" be "paid or accrued * * * on indebtedness." The term indebtedness requires an "existing unconditional enforceable obligation to pay a principal sum." Williams v. Commissioner, 47 T.C. 689, 692 (1967), affd. 409 F.2d 1361 (6th Cir. 1968); see also Gilbert v. Commissioner, 248 F.2d 399, 402 (2d Cir. 1957), remanding T.C. Memo. 1956-137, ("The classic debt is an unqualified *165 obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof.") In addition, the purported "indebtedness" cannot be the result of a "sham" transaction with no economic effect other than the reduction of taxes. [5]
It is with these principles in mind that we judge whether the interest payments to Bowater UK in question were deductible under section 163(a). The Commissioner stipulated that the declaration of the dividends at issue created, under applicable State (Delaware) law, an enforceable obligation of petitioner to pay money to Bowater UK. See also Anadarko Petroleum Corp. v. Panhandle Eastern Corp., 545 A.2d 1171 (Del. 1988); T. R. Miller Mill Co. v. Commissioner, 37 B.T.A. 43 (1938), affd. 102 F.2d 599 (5th Cir. 1939). The Commissioner also stipulated that, pursuant to an oral *166 understanding reached between petitioner and Bowater UK in 1976, no cash was to be transferred to Bowater UK on the dates that the dividends at issue were declared payable. And the Commissioner stipulated further that pursuant to the understanding between petitioner and Bowater UK, payment in cash would be made at a convenient time mutually agreed upon by the parties, but before the end of the year in which the dividend declaration was made. Finally, the Commissioner stipulated that, pursuant to the understanding reached between petitioner and Bowater UK, interest would be paid on this obligation at a rate based upon the prime rate. We find that the record makes clear that petitioner maintained control over funds legally belonging to Bowater UK, that a valid obligation existed, that the obligation to pay interest existed, and that payments of interest and principal were in fact made at a time agreed upon by the petitioner and Bowater UK. The Commissioner stipulated to all of these facts. Even in light of these stipulated facts, the Commissioner continues to attack the validity of the interest deduction. The Commissioner argues that this indebtedness should not be recognized *167 for tax purposes. The Commissioner's first argument is that the interest payments at issue represent merely disguised dividends which should not be deductible for tax purposes. We are not persuaded. The question whether payments to a shareholder represent interest or dividends has long been vexatious. Critical to the answer is whether an actual indebtedness exists. Over the years courts have relied upon certain criteria or factors to aid in determining whether an investment constitutes debt or equity. Some of these factors are the existence of an intent to repay, the extent to which the debt bears a substantial risk of the enterprise or is tied up indefinitely with the success of the venture, whether the debt is subordinate to those held by outsiders, whether a relatively fixed date of maturity is specified where the creditor can demand a fixed sum regardless of profits, the debt-equity ratio, whether outsiders would have made a loan on similar terms, and whether a market rate of interest was charged. See Nassau Lens Co. v. Commissioner, 308 F.2d 39, 47 (2d Cir. 1962), and cases cited therein. Taking these factors in order, we are convinced that *168 a valid indebtedness existed. With regard to an intent to repay, perhaps no better evidence of such an intent exists than the fact that the debt was in fact paid each year. As to whether the funds were put at the risk of the enterprise, this question can be answered by looking at petitioner's debt-equity ratios and earnings history. For the years made part of the record, petitioner's consolidated debt-equity ratio and earnings history were as follows: Debt-Equity
Book
Ratio [6] Earnings
1976
1.83:1
$ 40,419,000
1977
1.60:1
35,290,000
1978
1.88:1
32,730,000
1979
1.64:1
33,248,000
1980
1.36:1
81,583,000
Petitioner, along with its consolidated subsidiaries, *169 was well capitalized and had a strong earnings history. Repayment of the short-term debt at issue was subject to very little risk. There is no evidence that the debt at issue was subordinate to any other debt. As a recognized obligation under State law, there is no reason to doubt that the debt would receive treatment equal to any other unsecured debt in a (very unlikely) bankruptcy. As to a maturity date, we noted above that petitioner and Bowater UK agreed that payment would be made within the year of declaration. We note that courts have looked at whether the time of payment was relatively certain. See Nassau Lens Co. v. Commissioner, supra at 47; Smyers v. Commissioner, 57 T.C. 189, 197 (1971). The lack of an absolute payment date, in light of other factors here present, should not be fatal. The fact that Bowater UK could demand a sum certain appears evident to us. The amount owed was set by the declaration of the dividend by petitioner's board of directors. Contrary to assertions made by the Commissioner, petitioner's liability was not contingent upon any further act. While the source of the cash flowing *170 to Bowater UK may have originated with the dividends declared by petitioner's subsidiaries, that does not require the conclusion that payment to Bowater UK was legally conditioned upon receipt of those dividends. The debt-equity ratio has been discussed above. We are convinced that other lenders would have made similar loans to petitioner. The record shows that the Manufacturing Group maintained unsecured lines of credit totaling $ 27 million during the period at issue. These lines of credit could have served as a ready source of cash to petitioner, if necessary. Finally, the Commissioner stipulated that the interest rate charged petitioner is not an issue in this case. The Commissioner, in arguing that petitioner failed to prove that a valid indebtedness was established, correctly points out that in the present case no formal note or debenture was issued by petitioner to Bowater UK. The borrowings were not noted in the corporate minutes made part of the record. The Commissioner's argument fails to persuade us. In determining here whether a valid indebtedness existed, we note that the parties have stipulated that the amounts of the dividend (less the amounts withheld for *171 payment to the IRS) were treated as a liability by petitioner and as a receivable by Bowater UK. Petitioner and Bowater UK both accrued interest (payable and receivable, respectively), in a uniform fashion. And the immediate payment by petitioner of the applicable withholding tax is consistent with the view advanced by petitioner that the dividend was "paid" and then borrowed back. Further, we think that the issuance of formal notes of indebtedness by petitioner to its 100-percent shareholder, in light of the other indicia of debt here present, is not required. As stated in Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575, 578 (1968), acq. 1968-2 C.B. 2"we think it unwarranted to apply legalistic and mechanical tests, in the area of parent-subsidiary relationships, without regard to the realities of the business world and the manner in which transactions are handled in the normal and ordinary course of doing business. [7]
*172 The Commissioner's final attack on the indebtedness at issue is to characterize the transactions as a "sham", to argue that there was no business purpose for borrowing the funds at issue, and to characterize the payment of interest as a "scheme" designed to turn nondeductible dividends into deductible interest. We note first that throughout the Commissioner's brief and reply brief, it is repeatedly argued that when judging whether a "business purpose" existed for the borrowings at issue, we should look exclusively at petitioner and disregard the funds and capital needs of petitioner's consolidated subsidiaries. The Commissioner argued that petitioner had no business but to manage and supervise its subsidiaries, that it therefore had no need for the funds at issue, and that these transactions were simply designed to generate fictitious interest deductions. We find that argument to be unduly narrow. Petitioner is a holding company, a common parent to a number of operating companies that file a consolidated tax return. To judge a "business purpose" by looking only at the parent holding company is, in our opinion, inconsistent with the nature of the consolidated group, which is *173 recognized as such for tax purposes. As this Court has stated "the purpose of the consolidated return provisions * * * is 'to require taxes to be levied according to the true net income and invested capital resulting from and employed in a single business enterprise, even though it was conducted by means of more than one corporation.'" First Natl. Bank in Little Rock v. Commissioner, 83 T.C. 202, 209 (1984) (emphasis supplied, citations omitted). The Commissioner relies chiefly on two cases in developing the "sham" transaction theory. These are Knetsch v. United States, 364 U.S. 361 (1960), and Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965). [8] The Commissioner concedes that these cases are readily distinguishable on their respective facts. *174 In Knetsch, supra at 365, the Supreme Court, quoting Gregory v. Helvering, 293 U.S. 465, 469 (1935), stated: "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." The Second Circuit decided in Goldstein that section 163(a) did not intend to allow deductions for interest paid on debts that were entered into solely in order to obtain an income tax deduction. It held that "Section 163(a) * * * does not permit a deduction for interest paid or accrued in loan arrangements, like those now before us, that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences." Goldstein v. Commissioner, supra at 740. The deductibility of the interest at issue depends, then, on whether the loan transactions had substance beyond the expected tax consequences. Petitioner and its consolidated subsidiaries reported taxable income of $ 23,399,465 for the year ended 1979 and $ 56,074,965 for the year ended 1980. In order to generate this income, petitioner and its consolidated *175 group maintained debt (not including amounts owed to related companies) totaling $ 248,708,000 on December 31, 1979, and $ 272,737,000 on December 31, 1980. In light of the fact that petitioner and its consolidated group had substantial other borrowings tied up in a business that generated significant taxable income, evidencing a need for capital and cash beyond the amounts here at issue, we conclude that petitioner did have a purpose beyond tax expectations. As discussed above, the Commissioner argues that petitioner had no business that required borrowings of this type. That argument is misplaced here. One must look to the entire consolidated group for such a purpose. However, not only is the Commissioner's argument regarding petitioner's business purpose too narrowly drawn, but it is also incorrect. Petitioner did engage in business activity. As the Commissioner stipulated, the petitioner supervised the management of its subsidiaries, including their cash management and borrowing decisions. The record shows that the delay in the payment of the dividends at issue can be explained as a cash management decision. Petitioner's consolidated balance sheet shows a cash balance *176 of $ 10,983,000 on December 31, 1978, and $ 6,577,000 on December 31, 1979. [9] The immediate payment of dividends totaling $ 20,033,750 and $ 16,158,750 would have necessitated additional borrowings. It was for petitioner, as manager of the subsidiaries' borrowing needs, to decide whether any new debt would be taken on directly by petitioner or by its subsidiaries. It is irrelevant for tax purposes which specific company undertook this debt, because the total interest paid by the single business enterprise would remain the same. The tax consequences should not turn upon whether petitioner itself borrowed, rather than having a subsidiary borrow the same amount and then pass the funds up to petitioner. *177 Petitioner's decision to declare the dividends at issue early in the applicable year was also intended to meet the needs of its sole shareholder. As a subsidiary of a United Kingdom corporation, petitioner properly took into account the governing foreign law and accounting standards applicable to its parent corporation. In an attempt to deal with this unique situation, petitioner was faced with the need of its parent for dividends and its own ever present need for cash. The declaration of the dividends at issue followed by the subsequent borrowing of the same amounts satisfied everyone involved. [10]
*178 The Commissioner stated on brief that this case is not about the timing of the declaration of dividends, for the Commissioner "agrees that a corporation is free to declare dividends whenever it wants." The unusual business circumstances faced by petitioner necessitated the declaration of dividends at a time appropriate for its parent, Bowater UK. Having declared the dividends at a time earlier than it might otherwise have done, petitioner was forced to address its own capital needs. It did this by borrowing the funds at issue from Bowater UK. We find that the facts of this case prove that petitioner engaged in purposeful activity. Therefore, the "sham" transaction doctrine as developed by cases such as Knetsch and Goldstein is not applicable. Petitioner is entitled to a deduction for interest for the amounts at issue. We repeat the cautionary comment suggested in note 10, supra. This case is not to be taken as authority for the conclusion that the legal obligation growing out of the dividend declaration by, e.g., a Delaware corporation, gives rise to a deduction for interest paid on such obligation. This case is unique and the result turns upon the special facts *179 presented, including among other matters, the peculiar demands of the accounting standards and the law of the United Kingdom. To reflect the concessions of the parties and the previous opinion of this Court in this case, see supra p. 2, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Dividends were payable on, or within one or two days after, the date of declaration as set forth in the minutes of the Board of Directors.↩
3. Total dividend declared less Federal withholding tax paid at time of declaration. ↩
4. Amounts owed to subsidiaries of Bowater UK not included in petitioner's consolidated group.↩
5. See discussion infra↩ p. 16.
6. Our calculation of the debt-equity ratio differs slightly from the calculation contained in petitioner's brief because we have included in total debt amounts owed to unconsolidated subsidiaries of Bowater UK and amounts denoted in the audited financial statements as "minority interests". This results in the highest possible debt-equity ratio.↩
7. In Malone & Hyde, Inc. v. Commissioner, 49 T.C. 575↩ (1968), advances were found to be bona fide indebtedness. The advances were carried on open account on the books and records of both the parent and Malone & Hyde, Inc., no notes or other formal evidence of indebtedness were given, the advances were not secured, and no maturity date or rate of interest was specified. However, the advances were not subordinated to the claims of other creditors and the parent and Malone & Hyde, Inc., at all times expected that the advances would be repaid.
8. In Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284↩ (1965), the Second Circuit declined to apply the label "sham transaction", deciding rather to deny the deduction of interest for a "lack of purpose" with regard to the loan transaction. For convenience, we refer to these types of arrangements merely as "shams".
9. The Commissioner repeatedly asserted that petitioner was at all times "able to remit cash in satisfaction of the dividends", or petitioner "had the cash to pay the dividend." This appears to grow out of a stipulation made by the parties that stated "Petitioner was at all times solvent and able to make, and in fact did remit cash in satisfaction of the liabilities in issue". There is a critical difference between having the cash (as the Commissioner asserts) and being able to remit the cash (which could be obtained by borrowing).↩
10. Our decision here is based on these unique facts. It should not be seen as supporting the idea that a shareholder purpose is enough to satisfy a business purpose test in any other situation. See Estate of Parshelsky v. Commissioner, 303 F.2d 14 (2d Cir. 1962), revg. 34 T.C. 946 (1960); Rafferty v. Commissioner, 55 T.C. 490 (1970), affd. 452 F.2d 767 (1st Cir. 1971); sec. 1.355-2(b)(2), Income Tax Regs.↩