MEDIA SPACE, INC., PETITIONER *v*. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 25696–08.          Filed October 18, 2010.

P's charter granted its preferred shareholders redemption rights which if exercised triggered obligations by P to pay interest on the redemption amount if P was not able to pay the redemption amount. P and its shareholders entered into several consecutive forbearance agreements by which the shareholders agreed to forgo the redemption elections if they received payments resembling the interest payments. P deducted these payments, and R disallowed the deductions for 2004 and 2005. *Held*: The payments in question were not interest and therefore were not deductible under sec. 163, I.R.C. *Held*, *further*, all payments in 2004 were deductible under sec. 162, I.R.C., and the 12-month rule of sec. 1.263(a)–4(f)(5)(i), Income Tax Regs. However, payments in 2005 were not deductible to the extent that sec. 1.263(a)–4(d)(2)(i), Income Tax Regs., requires capitalization.

*Dustin F. Hecker* and *Steven A. Meyer*, for petitioner.
*William T. Derick*, for respondent.

OPINION

GOEKE, *Judge*: Respondent determined deficiencies in petitioner's income tax for the taxable years 2004 and 2005. The issue for decision is whether payments petitioner made to shareholders to delay redemption of their preferred shares are deductible under section 162 or 163.[1] For the reasons

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

424

stated herein, we find that the payments are deductible in part under section 162.

## Background

Some of the facts have been stipulated and are so found. Petitioner is a Delaware corporation whose principal place of business at the time it filed its petition was Norwalk, Connecticut. Since its incorporation in 1999 petitioner has conducted business in the field of media advertising sales.

Petitioner raised startup capital by issuing shares of stock. Petitioner had authority to issue shares of common stock, series A preferred stock, series B preferred stock, and undesignated preferred stock. In or before 2000 petitioner issued 5,197,176 shares of series A preferred stock and 231,389 shares of series B preferred stock to eCOM Partners Fund I, L.L.C. (the series A investor), for total consideration of $5 million. Also in or before 2000, petitioner issued 1,145,926 shares of series B preferred stock to E-Services Investments Private Sub, L.L.C. (the series B investor), for consideration of $11.9 million.

Article IV of petitioner's "Fourth Amended and Restated Certificate of Incorporation" (the charter) provided for dividends to be paid on the series A and B preferred stock at a rate of 8 percent per year. The charter also provided certain redemption rights to the series A investor and the series B investor (collectively, the investors). The investors had the right to require petitioner to redeem the preferred stock on September 30, 2003, or anytime thereafter. The investors were allowed to demand that petitioner "redeem, out of funds legally available therefor, up to one hundred percent (100%) of the originally issued and outstanding shares" of each series held by the investors.

The charter required that investors making redemption elections give to other holders of the preferred stock series and to petitioner "not less than fifteen (15) days prior written notice". Petitioner was required to redeem a series (in part or in whole) only if a majority of the holders of the specific series elected redemption.

The series A redemption price was defined in the charter as:

an amount in cash, equal to (i) $0.577237 per share of Series A Convertible Preferred Stock held by such holder (adjusted appropriately for stock splits, stock dividends, recapitalizations and the like with respect to the Series A Convertible Preferred Stock), plus (ii) any accumulated but unpaid dividends to which such holder of outstanding shares of Series A Convertible Preferred Stock is then entitled, if any, plus (iii) any interest accrued pursuant to Section A.5(e) hereof to which such holder of Series A Convertible Preferred Stock is entitled.

The series B redemption price was defined identically except that the cash amount was $8.6399988 per share and the interest accrued was pursuant to section B.5(e) of the charter.

Sections A.5(e) and B.5(e) of the charter addressed the possibility that petitioner could be prohibited from redeeming the shares under Delaware general corporation law because of an impairment of petitioner's capital or that petitioner could otherwise fail to redeem the shares as required by the charter. In such a case, petitioner was required to pay interest to the investors at the rate of 4 percent per annum, which would increase by 0.5 percent at the end of each 6-month period until paid in full, subject to a maximum rate of 9 percent per annum. Petitioner was also required to continue paying the 8-percent dividend on any shares it could not redeem. In addition, petitioner was required to "redeem such shares on a pro-rata basis among the holders * * * in proportion to the full respective redemption amounts to which they are entitled hereunder to the extent possible and shall redeem the remaining shares to be redeemed as soon as the Corporation is not prohibited from redeeming some or all of such shares".

Before September 30, 2003, petitioner and the investors recognized that petitioner would not have the funds to redeem all of the series A or series B preferred shares. Petitioner's auditors stated that if the redemption rights were able to be exercised before September 30, 2004, the auditors would need to issue a going concern statement on petitioner's financial statements. A going concern statement is issued when there are material doubts due to financial constraints as to whether a corporation will be able to operate. At the time, petitioner was attempting to negotiate a new financing agreement with Fleet Bank. A going concern statement could have caused Fleet Bank to back out of the financing arrange-

ment with petitioner and negatively affected petitioner's financial relationships with vendors.

Petitioner and the investors had several discussions in 2003 regarding redemption. The series A investor wished to exercise its redemption rights but realized doing so would not be feasible because petitioner would not be able to redeem the shares. The series A investor also wished not to forfeit its redemption right. The series B investor was short on cash and expressed its desire to have petitioner redeem its shares as soon as possible. Neither investor ever gave petitioner a written notice that it was electing to have shares redeemed.

Petitioner and the investors entered into negotiations regarding a forbearance agreement by which the investors would agree to forbear temporarily from exercising their redemption rights. Petitioner proposed a 1- to 2-year forbearance, but the investors limited the agreement to 1 year, wishing to regain their redemption rights as soon as possible while also enabling petitioner to avoid issuance of a going concern statement.

Petitioner and the investors entered into the forbearance agreement on September 30, 2003. The investors agreed to forbear from exercising their redemption rights until September 30, 2004. In exchange, petitioner agreed to pay the investors a "Forbearance Amount" on September 30, 2004. The "Forbearance Amount" was defined as:

with respect to the Series A Investor and the Series B Investor, as applicable, an amount equal to interest accruing at 4.0% per annum on the Redemption Amount applicable to such Investor commencing on September 30, 2003 and ending on the Termination Date, which interest rate shall increase by an additional 0.5% at the end of each six-month period thereafter, not to exceed 9.0% per annum (calculated on the basis of the actual number of days elapsed and a 360-day year and compounded annually).

The forbearance agreement also defined "Redemption Amount" as:

The sum of the Series A Convertible Redemption Price and the Series B Convertible Redemption Price then payable to the Series A investor or the Series B investor, as the case may be, assuming the Series A Convertible Redemption Date and the Series B Convertible Redemption Date had occurred on September 30, 2003 and such Investor had duly elected to require the Company to redeem all of its respective shares of Preferred Stock as of such date.

The forbearance amount payments (the forbearance payments) for the first year were thus equal to the amounts petitioner would have been required to pay the investors as interest under sections A.5(e) and B.5(e) of the Charter had the investors elected to have their shares redeemed and petitioner been unable to redeem them. Communication between the investors and petitioner made it clear that both parties believed and intended the forbearance payments to constitute interest as compensation for the investors' forbearance from receipt and use of the redemption amount.

The forbearance agreement was a contract separate from the charter. While the forbearance agreement did not provide for amendment of the charter in regard to the date on which the investors would gain the redemption right or the amount paid to the investors in return for deferral, it did provide for other amendments to the charter. While most of these amendments appear to be superficial, at least one of these amendments was substantive—removal of section 1.A.8(d)(ii). Removal of this section gave the holder of each series of preferred stock the power to block by majority vote "the redemption of * * * Common Stock from employees, officers, or Directors of, or consultants, advisors or independent contractors to, the Corporation or any of its subsidiaries".

As September 30, 2004, approached petitioner still did not have the funds to redeem the preferred shares. Petitioner and the investors began discussing an extension of the forbearance agreement. The series B investor again expressed its desire to have petitioner redeem its shares. After negotiations an 8-month extension was agreed upon, extending the expiration date to May 31, 2005. In reaching the 8-month agreement, the investors again rebuffed a proposal by petitioner to extend the forbearance agreement for more than a year. The investors wished to regain their redemption right as soon as possible, in case petitioner became able to redeem the shares.

The terms of the extension continued to track sections A.5(e) and B.5(e) of the charter for the length of this forbearance agreement extension. The initial payment rate of the September 30, 2004, extension was 5 percent per annum, which increased to 5.5 percent per annum after 6 months.

In advance of the new May 31 expiration date, petitioner was still unable to redeem the shares of stock. Another extension was agreed upon, extending the forbearance agreement expiration date to May 31, 2006. Since then the forbearance agreement has been extended four additional times, the latest extension lasting through May 31, 2010. The payment rate in each extension from May 31, 2005, has been 6.5 percent per annum, differing from the rate that would have been required by sections A.5(e) and B.5(e) of the charter.

Pursuant to the original forbearance agreement and the extensions, petitioner accrued and deducted $874,955 and $1,229,367 in 2004 and 2005, respectively. Petitioner deducted the 2004 forbearance payment on its 2004 corporate tax return as an interest expense under section 163 and deducted the 2005 amount on its 2005 return as a forbearance expense under section 162. The investors declared the payments as taxable interest on their own tax returns.

Petitioner had cashflow of negative $677,582 in 2003, $1,019,597 in 2004, and negative $1,428,554 in 2005. The reduction in cashflow in 2005 coincided with a $5 million increase in accounts receivable.

On August 26, 2008, respondent issued the notice of deficiency to petitioner, determining the following deficiencies:

| Year | Deficiency |
| --- | --- |
| 2004 | $19,035 |
| 2005 | 22,127 |

Petitioner timely petitioned this Court contesting respondent's determinations. A trial was held on November 3, 2009, in Boston, Massachusetts. At trial petitioner introduced an expert report which stated that forbearance agreements of various sorts are common in almost any business.

## Discussion

### I. *Burden of Proof*

Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); *INDOPCO, Inc. v. Commissioner*,

503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934).

## II. *Arguments of the Parties*

Petitioner argues that the forbearance payments deferred the payment of an obligation and thus may be deducted as interest under section 163. Petitioner also contends that the payments may be deducted under section 162 as ordinary and necessary business expenses.

Respondent argues that petitioner is prohibited from deducting the forbearance payments as interest under section 163 because petitioner did not make the payments on indebtedness. Respondent also contends that a number of Code sections as construed by regulations preclude petitioner from deducting the payments as ordinary and necessary business expenses under section 162.

## III. *Whether the Payments Were Deductible Under Section 163*

Respondent argues that the payments may not be deducted under section 163 because they were not made on indebtedness. Respondent contends that no indebtedness existed because the investors did not exercise the redemption right.

Petitioner argues the payments were made on indebtedness and that even a conditional obligation may give rise to indebtedness. Petitioner also contends that respondent's argument elevates form over substance because the result of the forbearance agreement was, in petitioner's view, the same as if the investors had made a redemption election.

For the reasons stated below, we find that although the parties intended the forbearance payments to constitute interest, the payments were not made on an existing indebtedness and therefore may not be deducted under section 163.

### A. *Section 163 in General*

Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." This Court has previously stated that in order for payments to constitute interest under section 163: (1) The parties must intend the payments to be interest, and (2) the law must give effect to this intention. *Midkiff v.*

*Commissioner*, 96 T.C. 724, 738 (1991), affd. sub nom. *Noguchi v. Commissioner*, 992 F.2d 226 (9th Cir. 1993); *Dunlap v. Commissioner*, 74 T.C. 1377, 1421 (1980), revd. on other grounds 670 F.2d 785 (8th Cir. 1982).

B. *Intent of the Parties*

The testimony and other evidence make it clear that the parties intended the forbearance payments to constitute interest. In the forbearance agreement the forbearance payments were identified and calculated as "interest" on the redemption amount. On their tax returns the investors declared the payments as taxable interest. Communications between petitioner and the investors indicated that all parties considered the forbearance payments to be interest payments. Respondent has offered no evidence that the parties did not intend the forbearance payments to constitute interest.

We find that the parties intended the payments to constitute interest. We must next determine whether the law will give effect to the intention of the parties.

C. *Whether the Law Gives Effect to the Intent of the Parties*

1. *Whether the Forbearance Payments Were Made on Indebtedness as Defined in Howlett*

Section 163(a) permits a deduction for "all interest paid * * * on indebtedness." Indebtedness is "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." *Howlett v. Commissioner*, 56 T.C. 951, 960 (1971); see also *Midkiff v. Commissioner*, *supra* at 734–735; *Indeck Energy Servs., Inc. v. Commissioner*, T.C. Memo. 2003–101.

Indebtedness must be genuine in substance, not merely in form. *Knetsch v. United States*, 364 U.S. 361, 365–366 (1960). Interest on indebtedness for purposes of section 163(a) requires more than "interest" labels or computations based on a percentage. *Williams v. Commissioner*, 47 T.C. 689, 692 (1967), affd. 409 F.2d 1361 (6th Cir. 1968). Therefore, the fact that petitioner and the investors characterized the forbearance payments as "interest" in their dealings is not dispositive.

Petitioner argues that the redemption right creates an indebtedness because it is "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum." See *Howlett v. Commissioner*, *supra* at 960 (defining "indebtedness"). Petitioner is mistaken. The redemption right itself does not create the obligation to pay a principal sum (the redemption amount); rather the *exercising* of the redemption right by the shareholders' written election creates the obligation to pay. Without a written election, no obligation for payment existed. No redemption election was made during the years at issue. Indeed, as of May 2010 (when the most recent forbearance agreement extension ended) the investors had yet to make a redemption election.

Petitioner's obligation to pay the redemption amount was predicated upon the preferred shareholders' making a written election to have petitioner redeem their shares. As of May 2010 no such election had been made. Therefore, petitioner had no obligation to pay the redemption amount. As petitioner had no obligation to pay a principal sum, there was no indebtedness as defined in *Howlett*. See *Howlett v. Commissioner*, *supra* at 960 (indebtedness requires an existing obligation for payment of a principal sum).

## 2. *The Conditional Obligation Exception*

Petitioner notes that in some circumstances conditional obligations may be treated as indebtedness. See *Halle v. Commissioner*, 83 F.3d 649, 653 (4th Cir. 1996), revg. *Kingstowne v. Commissioner*, T.C. Memo. 1994–630. The Court of Appeals for the Fourth Circuit in *Halle v. Commissioner*, *supra* at 653, stated:

even if materially conditional, an existing, legally enforceable obligation may still give rise to indebtedness, so long as (1) the contingency on which the obligation rests is beyond the control of the party seeking the interest deduction, (2) the amount of the indebtedness on which the interest accrued was fixed as of the date that the interest began to accrue, and (3) the payor's liability to the payee is primary and direct. * * *

See, e.g., *Journal Co. v. Commissioner*, 125 F.2d 349, 350–351 (7th Cir. 1942), revg. 44 B.T.A. 460 (1941); *Midkiff v. Commissioner*, *supra* at 739–745; *Dunlap v. Commissioner*, *supra* at 1424; *Kaempfer v. Commissioner*, T.C. Memo. 1992–19.

In *Dunlap*, the corporate taxpayer entered into a contract with a seller to purchase stock. The taxpayer provided promissory notes as part of the purchase price. The agreement was subject to approval by a third party. While approval was pending, interest accrued on the purchase price. The Court allowed a deduction for interest accrued while third-party approval was pending, even though the obligation was materially conditional during this period.

Petitioner argues that the obligation to pay the redemption amount exists and is legally enforceable but is conditioned upon the redemption election of the shareholders. We disagree, again finding that the obligation to pay the redemption amount did not exist.

Unlike the interest in *Dunlap*, the "interest" in this case was not accrued in a period during which the obligation to pay the debt was conditional. Petitioner had no obligation to pay the redemption amount during the period of "interest" accrual because the investors had not elected to have their shares redeemed. The "interest" payments deferred the investors' receipt of the redemption right; they did not relate to deferred payment of an existing but conditional debt as in *Dunlap*.

Petitioner has no obligation to pay the redemption amount until the investors make a redemption election. Until such an election occurs, no debt exists. Therefore the *Halle* conditional debt exception does not apply. See *Halle v. Commissioner*, *supra* at 653 (requiring "an *existing*, legally enforceable obligation" (emphasis added)).

### 3. *Whether Respondent's Argument Elevates Form Over Substance*

Petitioner argues respondent's position elevates form over substance. Petitioner contends the forbearance agreement was merely a formality and that the substantive result of the forbearance agreement is that petitioner has an obligation to pay the redemption amount to the investors.

As petitioner's principal place of business is in Connecticut, the Court of Appeals for the Second Circuit has appellate jurisdiction. See sec. 7482(b)(1)(B). The Tax Court will generally defer to the rule adopted by the Court of Appeals for the circuit to which appeal would normally lie, if that Court

of Appeals has ruled with respect to the identical issue. See *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971); *Becker v. Commissioner*, T.C. Memo. 2006–264 (discussing a similar issue in the context of precedent of the Court of Appeals for the Fifth Circuit). The Court of Appeals for the Second Circuit has adopted the "strong proof" rule, stating: "when the parties to a transaction such as this one have specifically set out the covenants in the contract * * * strong proof must be adduced by them in order to overcome that declaration." *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957). We look to the facts to determine whether "strong proof" exists to support petitioner's argument that the substantive result of the forbearance agreement is the same as if the investors had actually made a redemption election. See, e.g., *id.* at 308–309; *Croyle v. Commissioner*, T.C. Memo. 1980–501.

In 2003 and 2004 the investors made clear their desire to have petitioner redeem their shares upon their receipt of the redemption right. The series B investor told petitioner it intended to exercise the redemption right as soon as possible. Petitioner argues that these statements show that the investors were undoubtedly going to make a redemption election as soon as they gained the redemption right. As a result, petitioner contends that the redemption amounts are in substance its obligation to the investors, even though no actual election was made. We disagree.

Comparing the results of the forbearance agreement and the results that would have occurred had a redemption election been made reveals a glaring difference: petitioner would not be legally bound to redeem the investors' shares as a result of the forbearance agreement. If the investors had made a redemption election, petitioner would have been bound to redeem the shares pro rata as petitioner became financially able to redeem them. Under the redemption election scenario the investors are entitled to redemption, but under the forbearance agreement the investors retain the choice of whether or not to have their shares redeemed.

While the investors had expressed their desire to have their shares redeemed as soon as possible, such statements are not legally binding. Indeed, nearly 7 years after the first forbearance agreement was signed the investors still have

not elected to have a single one of their shares redeemed. By the time the forbearance agreements cease to be extended (whenever that may be), the investors may unilaterally decide to hold their shares instead of having them redeemed.

We find that petitioner has not met the "strong proof" standard. Both formal and substantive differences exist between the terms of the forbearance agreement and the terms which would have applied had the investors made a redemption election. The mere fact that the investors made nonbinding statements indicating they wished to have their shares redeemed as soon as possible does not create a substantive indebtedness.

### D. *Conclusion Regarding Section 163*

The caselaw relating to instances in which interest accrues on a conditional debt is not well defined. See generally Hill, Casenote, "Darkening the Already Murky Waters of I.R.C. § 163: Halle v. Commissioner", 15 T.M. Cooley L. Rev. 49 (1998). However, all courts dealing with interest issues have held that an actual indebtedness must exist in order for interest payments to be deductible. See, e.g., *Halle v. Commissioner*, 83 F.3d 649 (4th Cir. 1996); *Howlett v. Commissioner*, 56 T.C. 951 (1971); *Bowater Inc. v. Commissioner*, T.C. Memo. 1995–164 ("The question whether payments to a shareholder represent interest or dividends has long been vexatious. Critical to the answer is whether an actual indebtedness exists."). We will not depart from this clear standard. We find petitioner may not deduct the forbearance payments as interest under section 163.

### IV. *Whether the Payments Were Deductible Under Section 162*

Petitioner argues the forbearance payments may be deducted as ordinary and necessary business expenses. Respondent argues that regulations and Code sections prevent petitioner from deducting the payments under section 162. For the reasons stated below, we find the forbearance payments are partially deductible under section 162.

### A. *Business Expenses in General*

Section 162(a) provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or

incurred during the taxable year in carrying on any trade or business". A number of other Code sections and regulations differentiate deductible ordinary and necessary expenses from payments made to reacquire stock, distributions to shareholders, and capital expenditures. See, e.g., secs. 162(k), 301, 361, 263; sec. 1.263(a)–4, Income Tax Regs. Our analysis must first determine whether the requirements of section 162(a) have been satisfied. We will then determine whether any other Code sections or regulations preclude a deduction under section 162(a).

B. *Whether the Payments Met the Requirements of Section 162(a)*

To be deductible under section 162(a), an expense must be "ordinary and necessary" and "paid or incurred during the taxable year in carrying on any trade or business". Respondent does not contest the fact that the forbearance payments were paid during the taxable year in carrying on a business. We must determine whether such payments were ordinary and necessary.

"Ordinary has the connotation of normal, usual, or customary. To be sure, an expense may be ordinary though it happen but once in the taxpayer's lifetime. * * * Yet the transaction which gives rise to it must be of common or frequent occurrence in the type of business involved." *Deputy v. du Pont*, 308 U.S. 488, 495 (1940); see also *United Title Ins. Co. v. Commissioner*, T.C. Memo. 1988–38.

Petitioner produced an expert report by Richard A. Clarke, an expert in investment business. Mr. Clarke has 32 years of experience in banking, during which time he has participated in hundreds of forbearance arrangements. Mr. Clarke's report states that forbearance agreements, such as the one in this case, are common in almost any business, including petitioner's line of business. Mr. Clarke knew of "at least five" advertising agencies participating in forbearance agreements during his time in banking. Respondent has introduced no evidence contesting that such forbearance agreements are common in the type of business petitioner conducts. We find the payments were ordinary.

"[T]he term 'necessary' imposes 'only the minimal requirement that the expense be "appropriate and helpful" for "the

development of the [taxpayer's] business"'". *INDOPCO, Inc. v. Commissioner*, 503 U.S. at 85 (quoting *Commissioner v. Tellier*, 383 U.S. 687, 689 (1966)). The forbearance payments allowed petitioner to avoid issuance of a going concern statement on petitioner's financial statements. This helped petitioner gain financing and maintain good financial relationships with its vendors. We therefore find the payments were necessary.

We conclude that the forbearance payments are ordinary and necessary under section 162(a). We now must determine whether the payments were nondeductible payments made to reacquire stock, nondeductible distributions to shareholders, or capital expenditures (which either are nondeductible or must be capitalized).

C. *Whether Section 162(k) Precludes a Deduction Under Section 162(a)*

Section 162(k)(1) prohibits a deduction "for any amount paid or incurred by a corporation in connection with the reacquisition of its stock".

Respondent argues that petitioner in substance exchanged the forbearance payments and new preferred stock with deferred redemption rights for old preferred stock with non-deferred redemption rights. Respondent has cited no caselaw in support of this assertion.

We agree with respondent that petitioner's tax liability is determined by the substance of the transaction. See *Gregory v. Helvering*, 293 U.S. 465, 469–470 (1935); *Pinson v. Commissioner*, T.C. Memo. 2000–208. However, we disagree with respondent that the transaction is in substance a reacquisition of petitioner's stock. A taxpayer may "decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering, supra* at 469. We find that section 162(k) was not intended to cover such a situation and that the transaction in substance is not a reacquisition of stock.

We do not believe deferring the redemption right by a year or less at a time is such a significant change in the nature

of the investment as to amount to a new investment. The nature and structure of petitioner's business did not change as a result of the forbearance agreement, and the preferred stock retained all other rights, including receipt of the 8-percent dividend. Petitioner would not likely have been able to redeem the investors' shares even had the investors gained and exercised the redemption right, and the investors had previously agreed to be paid compensation should they make a redemption election and petitioner be unable to redeem.

Considering the facts of the case, we find that the forbearance agreement between petitioner and the investors was not in form or in substance a reacquisition of stock and section 162(k) does not preclude a deduction under section 162(a).

D. *Whether Section 361(c)(1) Precludes a Deduction Under Section 162(a)*

Section 361(c)(1) provides that "no gain or loss shall be recognized to a corporation a party to a reorganization on the distribution to its shareholders of property in pursuance of the plan of reorganization." Under section 368(a)(1)(E), a reorganization includes a recapitalization.

The Supreme Court has defined a recapitalization as a "reshuffling of a capital structure, within the framework of an existing corporation". *Helvering v. Sw. Consol. Corp.*, 315 U.S. 194, 202 (1942); see also *Microdot, Inc. v. United States*, 728 F.2d 593, 596 (2d Cir. 1984). Respondent contends that a reshuffling of petitioner's capital structure occurred because petitioner in substance exchanged the forbearance payments and new preferred stock with deferred redemption rights for old preferred stock with nondeferred redemption rights.

For the same reasons stated hereinabove, we find that no exchange of stock occurred in form or in substance. See *supra* pp. 437–438. Therefore, we find that there was no reorganization and that section 361(c)(1) does not preclude a deduction under section 162(a).

E. *Whether the Payments Were Distributions, Precluding a Deduction Under Section 162(a)*

Under section 311(a) a corporation generally does not recognize gain or loss on a distribution of property with respect

to its stock. The term "property" includes money. Sec. 317(a). Section 301 treats the distribution as either a dividend, a reduction of basis, or a gain from the sale or exchange of property. See sec. 301(a), (c).

Section 1.301–1(l), Income Tax Regs., provides that a "distribution to shareholders with respect to their stock is within the terms of section 301 although it takes place at the same time as another transaction if the distribution is in substance a separate transaction whether or not connected in a formal sense." The regulation provides the following example:

if a corporation having only common stock outstanding, exchanges one share of newly issued common stock and one bond in the principal amount of $10 for each share of outstanding common stock, the distribution of the bonds will be a distribution of property * * * to which section 301 applies, even though the exchange of common stock for common stock may be pursuant to a plan of reorganization under the terms of section 368(a)(1)(E) (recapitalization) and even though the exchange of common stock for common stock may be tax free by virtue of section 354. [*Id.*]

Respondent argues that the forbearance payments were in substance nondeductible distributions to the investors with respect to their stock, regardless of the fact that the payments were connected in a formal sense to the deferral of the redemption right. Respondent contends these distributions were given to provide the investors with a return on their investment in petitioner.

We agree that petitioner's tax liability is determined by the substance of the transaction. See sec. 1.301–1(l), Income Tax Regs. However, we disagree that the forbearance payments were in substance distributions with respect to the investors' stock in petitioner.

"Distribution of profits is neither the purpose nor effect of the action taken by the corporation" in this case. See *Palmer v. Commissioner*, 302 U.S. 63, 73 (1937). Here the corporation received valuable deferral rights in return for the forbearance payments. Respondent did not allege, and we have found nothing to suggest, that the amounts petitioner paid to the investors to defer the redemption rights were in excess of the fair market value of deferral of those rights. See, e.g., *Evans v. Commissioner*, T.C. Memo. 1992–276 (citing *Palmer v. Commissioner*, *supra*) (where the Commissioner argued "that a bargain sale by a corporation to its shareholder is a distribution to the shareholder that is sub-

ject to section 301" when a corporation allegedly sold assets to the shareholder below fair market value).

We find that petitioner paid the investors to defer the redemption election, not to give the investors a return on their investment. The payments were not distributions in substance under section 301 or section 1.301–1(l), Income Tax Regs., such as would preclude their deduction under section 162(a).

### F. *Whether Section 263 Precludes a Deduction Under Section 162(a)*

Under section 263(a)(1), "No deduction shall be allowed for—(1) Any amount paid out for * * * permanent improvements or betterments made to increase the value of any property or estate." Section 1.263(a)–4, Income Tax Regs., "provides rules for applying section 263(a) to amounts paid to acquire or create intangibles." It applies to amounts paid or incurred on or after December 31, 2003. Sec. 1.263(a)–4(o), Income Tax Regs.

Petitioner cites several cases as authority for the proposition that section 263(a)(1) does not apply. However, the cases petitioner cites do not deal with improvements such as the ones in this case.

### 1. *Section 1.263(a)–4(c), Income Tax Regs.*

Section 1.263(a)–4(c)(1), Income Tax Regs., provides: "A taxpayer must capitalize amounts paid to another party to acquire any intangible from that party in a purchase or similar transaction." The term "intangible" includes an ownership interest in a corporation. Sec. 1.263(a)–4(c)(1)(i), Income Tax Regs. Respondent argues that petitioner in substance exchanged the forbearance payments and new preferred stock with deferred redemption rights for old preferred shares with nondeferred redemption rights. Respondent contends that as a result, petitioner paid the investors to acquire an ownership interest in a corporation (itself) and that section 1.263(a)–4(c)(1), Income Tax Regs., therefore requires capitalization of the amount paid.

For the same reasons stated hereinabove, we again find that no exchange of stock ownership occurred in form or in

substance. See *supra* pp. 437–438. We therefore find that section 1.263(a)–4(c)(1), Income Tax Regs., does not apply.

2. *Section 1.263(a)–4(d), Income Tax Regs.*

Section 1.263(a)–4(d)(2)(i), Income Tax Regs., provides: "A taxpayer must capitalize amounts paid to another party to create, originate, enter into, renew or renegotiate with that party * * * [certain] financial interests". A financial interest includes an ownership interest in a corporation (stock). Sec. 1.263(a)–4(d)(2)(i)(A), Income Tax Regs.

Respondent first contends that section 1.263(a)–4(d)(2)(i), Income Tax Regs., requires capitalization of the forbearance payments because a financial interest (stock) was created. Respondent argues petitioner in substance exchanged forbearance payments and newly created preferred stock with deferred redemption rights for old preferred stock with nondeferred redemption rights. Yet again, for the same reasons stated hereinabove, we find that no exchange of stock ownership occurred in form or in substance. See *supra* pp. 437–438. Therefore, no financial interest was created.

Respondent also contends that section 1.263(a)–4(d)(2)(i), Income Tax Regs., requires capitalization of the forbearance payments because the terms of a financial interest (stock) were modified. See sec. 1.263(a)–4(d)(2)(iii), Income Tax Regs. ("A taxpayer is treated as renegotiating a financial interest if the terms of the financial interest are modified."). While the forbearance agreement did not in form amend the charter provision regarding the date on which the investors would gain the redemption right, respondent argues that petitioner in substance paid the investors to modify this term. We agree with respondent.

Before the forbearance agreement was entered into, the investors could have exercised their redemption right on September 31, 2003; afterwards they were not able to exercise their redemption right until September 31, 2004. Such a pattern of deferral continued in each extension to the forbearance agreement. A change of the charter's provision regarding the date on which the investors could exercise their redemption rights was the aim of the parties and was effectively the result accomplished by the forbearance agreement.

Petitioner has argued that it and the investors were attempting to follow, not modify, the provisions of the charter by entering into the forbearance agreement. However, as discussed *supra* pp. 434–435, substantive differences exist between the results of the forbearance agreement and the results that would have occurred had an investor made an actual redemption election. The forbearance agreement did not follow the provisions of the charter; it modified the charter term identifying the date on which the investors would receive the redemption right. Payments resembling interest were made to the investors to effect this modification.

We also note that the forbearance agreement provided for some amendments to the charter itself. While none of these amendments related to the date on which the investors would gain the redemption right, at least one of the amendments (removal of section 1.A.8(d)(ii), which allowed the investors to bar petitioner from redeeming employees' common stock) was substantive.

The forbearance agreement was a contract meant to modify the rights of the parties under the charter. Some terms it modified by actually amending the charter (i.e., removal of section 1.A.8(d)(ii)). Other terms it modified by acting as an external contract (i.e., the date on which the investors gained the redemption right). We must "[disregard] the mask and [deal] with realities." *Helvering v. Minn. Tea Co.*, 296 U.S. 378, 385 (1935). The reality here is that the forbearance agreement modified the charter provision identifying the date on which the investors would gain the redemption right. We therefore find that section 1.263(a)–4(d)(2)(i), Income Tax Regs., requires capitalization of the forbearance payments.

3. *The 12-Month Rule of Section 1.263(a)–4(f)(1), Income Tax Regs.*

As we have found that section 1.263(a)–4(d)(2)(i), Income Tax Regs., requires capitalization of the payments, we must additionally determine whether the "12-month rule" applies in this case. Section 1.263(a)–4(f)(1), Income Tax Regs., provides the 12-month rule:

a taxpayer is not required to capitalize under this section amounts paid to create * * * any right or benefit for the taxpayer that does not extend beyond the earlier of—

(i) 12 months after the first date on which the taxpayer realizes the right or benefit; or

(ii) The end of the taxable year following the taxable year in which the payment is made.

The original forbearance agreement and the extensions each meet these requirements. However, two other subparagraphs of the regulation may prevent petitioner from taking advantage of the 12-month rule.

Section 1.263(a)–4(f)(3), Income Tax Regs., provides that the 12-month rule does not apply to amounts paid to create a section 197 intangible or amounts paid to create an intangible described in section 1.263(a)–4(d)(2), Income Tax Regs. Although we have previously found that the terms of the investor's redemption rights were *modified* by the forbearance agreement, no intangible (stock) was *created* by the forbearance agreement. See *supra* pp. 441–442. Therefore, section 1.263(a)–4(f)(3), Income Tax Regs., does not prevent the 12-month rule from applying.

Section 1.263(a)–4(f)(5)(i), Income Tax Regs., provides that "the duration of a right includes any renewal period if all of the facts and circumstances in existence during the taxable year in which the right is created indicate a reasonable expectancy of renewal." If any two deferral periods are considered together in this case, they last longer than 12 months. Thus, if there was a reasonable expectancy of renewal (extension) of the forbearance agreement, the 12-month rule would not apply, and petitioner would be forced to capitalize the forbearance payments.

Section 1.263(a)–4(f)(5)(ii), Income Tax Regs., provides five factors that are "significant in determining whether there exists a reasonable expectancy of renewal". We consider each of these factors, as well as other factors specific to the facts and circumstances.

a. *Renewal History*

The fact that similar rights have been renewed in the past is evidence of a reasonable expectancy of renewal. When the taxpayer has no experience with similar rights, this factor is

less indicative of a reasonable expectancy of renewal. Sec. 1.263(a)–4(f)(5)(ii)(A), Income Tax Regs.

There is no evidence that petitioner had any prior experience with similar arrangements at the time of the original forbearance agreement. However, as the forbearance agreement continued to be extended, petitioner naturally gained experience with similar arrangements. We find this factor is neutral in regard to the September 2003 agreement but begins to indicate a reasonable expectancy of renewal in regard to the September 2004 agreement. We also find this factor strongly indicates a reasonable expectancy of renewal in regard to the May 2005 agreement.

### b. *Economics of the Transaction*

The fact that renewal is necessary for the taxpayer to earn back its investment in the right is evidence of a reasonable expectancy of renewal. For example, if a taxpayer pays $14,000 for a 9-month contract which earns the taxpayer $1,000 per month, the fact that renewal is necessary for the taxpayer to earn back its investment is evidence that a reasonable expectancy of renewal existed. Sec. 1.263(a)–4(f)(5)(ii)(B), Income Tax Regs.

In this case, there was no investment comparable to the example found in the regulations. The only investment was that of the investors in petitioner's stock, and extension of the forbearance agreement was not necessary for them to earn back their investment. We find this factor is neutral.

### c. *Likelihood of Renewal by Other Party*

Evidence that indicates a likelihood of renewal to a right, such as a bargain renewal right or similar arrangement, is evidence of a reasonable expectancy of renewal. Sec. 1.263(a)–4(f)(5)(ii)(C), Income Tax Regs.

There was no bargain renewal provision or similar arrangement in the forbearance agreement. We find this factor is neutral.

### d. *Terms of Renewal*

The fact that material terms of the right are subject to renegotiation at the end of the initial term is evidence of a lack of a reasonable expectancy of renewal. For example, if

the parties must renegotiate price, this is evidence that no reasonable expectancy of renewal existed. Sec. 1.263(a)–4(f)(5)(ii)(D), Income Tax Regs.

Petitioner and the investors renegotiated the amount of the forbearance payments, the length of the deferral at the end of the original agreement, and the extensions. The amount paid increased as a result of the September 2004 and May 2005 extensions, and the length was reduced to 8 months in the September 2004 extension (down from 12 months in the September 2003 original agreement) but then again pegged at 12 months in the May 2005 agreement. We find the fact that material terms were renegotiated is evidence that no reasonable expectancy of renewal existed.

### e. *Terminations*

The fact that similar rights are typically terminated before renewal is evidence of a lack of a reasonable expectancy of renewal. Sec. 1.263(a)–4(f)(5)(ii)(E), Income Tax Regs.

There is no evidence that petitioner ever previously had experience with a similar right or terminated such a right. The parties have supplied, and we have found, no evidence that rights similar to those in this case are typically terminated within the industry. We find this factor is neutral.

### f. *Petitioner's Financial Condition*

The likelihood of renewal was also partially dependent on petitioner's financial health. While no provisions of the forbearance agreement prevented its extension past the point at which petitioner became financially able to redeem the shares, we believe that petitioner would be less likely to agree to a further extension as its financial condition improved.

Petitioner's cashflow increased from negative $677,582 in 2003 to $1,019,597 in 2004, an increase of $1,697,179. When the original forbearance agreement expired on September 30, 2004, petitioner did not demand a yearlong extension of the forbearance agreement but instead negotiated a shorter 8-month extension. The fact that the length of the extension was cut as cashflow was improving may well indicate that petitioner believed it would be able to redeem the shares without further extensions.

However, in 2005 petitioner's cashflows deteriorated to a loss of $1,428,554, representing a $2,448,151 decline from 2004. With the forbearance agreement extension set to expire on May 31, 2005, petitioner negotiated a 1-year extension. The May 31, 2005, extension was increased to 1 year (from the 8-month September 30, 2004, extension) at the same time cashflows were plummeting. This may well indicate that petitioner believed its ability to redeem was weakening, and that further extensions past May 2006 could be necessary before petitioner could redeem the shares.

### g. *Conclusion Regarding the 12-Month Rule*

Weighing the factors in the light of the facts and circumstances, we find that no reasonable expectancy of renewal existed at the time the September 2003 and September 2004 agreements were created. Thus, petitioner may take advantage of the 12-month rule for the September 2003 and September 2004 agreements. However, we find that a reasonable expectancy of renewal existed at the time the May 2005 agreement was created. We therefore consider the term of the May 2005 agreement to be combined with the term of the May 2006 agreement. Combined, the terms of those agreements extend beyond 12 months, and consequently, petitioner may not take advantage of the 12-month rule for the May 2005 agreement.

### h. *Conclusion Regarding Section 162*

We have found that the forbearance payments satisfy the "ordinary and necessary" test of section 162(a). We have also determined that section 1.263(a)–4(d)(2)(i), Income Tax Regs., requires capitalization of the forbearance payments, but that the 12-month rule of section 1.263(a)–4(f)(5)(i), Income Tax Regs., removes the original September 2003 agreement and the September 2004 extension from the purview of section 1.263(a)–4(d)(2)(i), Income Tax Regs. The forbearance payments which accrued during 2005 as a result of the May 2005 extension must be capitalized under section 1.263(a)–4(d)(2)(i), Income Tax Regs. The forbearance payments relating to the September 2003 and September 2004 agreements are deductible as business expenses under section 162.

V. *Conclusion*

We find petitioner may not deduct the forbearance payments as interest under section 163. However, we find that petitioner may deduct the forbearance payments relating to the September 2003 and September 2004 agreements as business expenses under section 162. The forbearance payments relating to the May 2005 agreement must be capitalized under section 263.

To reflect the foregoing,

*Decision will be entered under Rule 155.*